## Richmond

F. F. WHITE AND P & W OIL COMPANY, INCORPORATED v. EDGAR B. PERKINS.

June 12, 1972.

Record No. 7730.

Present, Snead, C.J., l'Anson, Harrison, Cochran and Harman, JJ.

*T. Munford Boyd; George Harrison Gilliam (Paxson, Marshall & Smith, on brief), for appellants.*

*Harry P. Anderson, Jr. (Anderson, Haw, Parkerson & Beazley, on brief), for appellee.*

HARMAN, J., delivered the opinion of the court.

This is an appeal from a final decree by the trial court holding a minority stockholder, Edgar B. Perkins (Perkins), entitled to relief by reason of oppressive acts by F. F. White (White), who was an officer, director and majority stockholder of P & W Oil Company, Incorporated (the company). While holding White's conduct oppressive, the court declined to decree dissolution of the company.

In lieu of dissolution the court decreed: (1) that the company should declare and pay a dividend of $8,000.00 to its stockholders; (2) that White's claims against the company in the amount of $11,240.18 be disallowed; (3) that the amount owing to the company by a service station controlled by White be kept "reasonably current in the future;"[1] and (4) that Perkins, whose employment with the company had been terminated, be paid severance pay in the amount of $1,600.00, equivalent to ten weeks' salary.

White claims that the evidence fails to sustain the court's finding of oppression and Perkins argues the court erred in not decreeing that the company be dissolved.

The company was incorporated in June, 1967, with capital of $40,000.00. White owned 55% and Perkins owned 45% of its stock. The company was formed primarily to act as a jobber for products of American Oil Company (American).

White and Perkins first became acquainted in 1967 when each became interested in obtaining a jobber's contract with American. White, among other business interests, controlled a gasoline service station in Fork Union which was the largest customer of American products in the area. He also controlled a storage facility for fuel oil near Fork Union.

Perkins, a native of Louisa County, had been a salaried employee of another oil company at various locations for approximately 15 years. He was interested in returning to his former home if suitable employment was available.

American owned and operated a "bulk plant" in Mineral, Louisa County, which supplied three service stations, including White's,

---

[1] At the time of the *ore tenus* hearing the balance owing on this account was $12,424.20. When the final decree was entered on December 12, 1970, this amount had been reduced to less than $4,000.00.

with gasoline, oil, tires and other related products. American's bulk plant also supplied fuel oil to other customers, including home owners, in the area.

Both White and Perkins were negotiating for a jobber's contract with American. It was apparently at the suggestion of the management of American that they began negotiating with each other with a view of jointly obtaining the jobber's contract.

Perkins initially proposed to White that they enter into an equal partnership but White declined. White had apparently had an unhappy experience with an earlier partnership arrangement and described a partnership as a "pretty poor ship." They finally agreed, at White's insistence, that a corporation would be formed with White as the majority stockholder.

Perkins, White and R. P. Zehler, Jr. (Zehler), White's attorney, were named the initial directors of the corporation. Perkins was named as President with White serving as Vice President and Treasurer and Zehler as Secretary. White and Perkins, the only stockholders, joined in a Subchapter S election by the company for Federal income tax purposes.

The company entered into a jobber's contract with American. American leased its bulk plant at Mineral and two service stations to the company. The company, in turn, subleased the service stations.

Perkins testified that White had originally agreed to lease his service station at Fork Union to the company but refused to do so after the contract with American was signed.

The company began operations in July, 1967, with Perkins as its only full time salaried employee. During its first fiscal year of operation, to July 1, 1968, it showed a profit, after state income taxes, of more than $14,000.00. For fiscal 1968-69 the company showed earnings, after state income taxes, of more than $10,000.00. Because of the Subchapter S election, White and Perkins were required to report 55% and 45% respectively of these amounts as income on their Federal income tax returns. Because White would not agree, the company never paid a dividend to its stockholders.

It would appear that White's refusal to honor his agreement to lease his service station to the company created the initial conflict between Perkins and him.

A later conflict between them arose over White's refusal to Perkins' suggestion on many occasions that dividends be paid to the stockholders. Perkins was required to pay Federal income taxes on

money which he was not actually receiving. His testimony is that he was financially pressed because of this, a fact of which White was aware.

As early as February, 1969, Perkins proposed to White in writing that his weekly salary be increased and that some agreement be reached to increase his stock ownership to 50% of the outstanding stock "at no cost to me." White agreed to increase Perkins' salary to $160.00 per week but refused to consider Perkins' request for additional stock.

In December, 1969, Perkins sent White a memorandum proposing that he receive a salary increase, additional stock "to give me 50% equity at no cost to me" and "minimum annual dividends of $2500.00 each." In the same memorandum Perkins proposed the terms of a lease between White and the company for White's service station. White declined to agree to any of these proposals.

Thereafter, early in 1970, Perkins proposed to either sell his stock to White or buy White's stock but White would not accept either proposal.

On June 30, 1969, White's service station did not owe the company anything. Between that date and July, 1970, the outstanding balance owed the company by White's service station was permitted, over Perkins' protest, to increase until it stood at $12,424.20 at the time of the *ore tenus* hearing in July, 1970. At one time during this period the company could not meet its payroll.

Perkins and White met in late May, 1970. At that meeting Perkins disclosed to White that he had consulted counsel. He told White that he would not thereafter attend stockholders' or directors' meetings and that he would attempt to dissolve the corporation.

The following day, without Perkins' knowledge or acquiescence but for the company's account, White placed an order for equipment costing almost $2,800.00 to be installed at his service station upon which the company had no lease. At the same time White placed an order for equipment, costing more than $3,500.00 installed, to be installed at one of the service stations leased from American.

At White's direction notice was given on June 10 for a special stockholders' meeting of the company on June 22.

Perkins instituted this suit on June 19.

At the stockholders' meeting on June 22 the by-laws of the company were amended on White's motion to increase the board of

directors from three to five members. White nominated and voted his stock to elect a board of directors composed of himself, his wife, his son, his attorney and Perkins.

At a later directors' meeting Perkins was replaced as president by White, whose wife was elected as secretary-treasurer. Perkins was named Vice President of the company.

On June 23, White mailed a bill to Perkins claiming the company owed him $11,240.18 for rental on his service station and fuel oil storage facility. The evidence shows no lease or other obligation of the company to pay rent for the service station. The company had been making limited use of the fuel oil facility with White's consent. Until then his only demand had been that the company pay the electric power bills at the fuel oil facility. Perkins promptly notified White he would resist payment of these claims.

The trial court heard the evidence *ore tenus* on July 14. Counsel argued the case on July 31.

Perkins' employment with the company was terminated on August 25.

Code § 13.1-94 provides, in part:

"Any court of record, with general equity jurisdiction . . . shall have full power to liquidate the assets and business of the corporation *and, but only in the case of either subparagraph (a) or (b) below and where the court also finds it would be in the best interests of both the creditors and stockholders of the corporation, to appoint one or more persons to be custodians of such corporation with authority to continue the business of the corporation, with full authority to declare dividends and to take all other such actions as might be taken by the board of directors, until such time as the court determines (1) that it would be in the best interests of the creditors and its stockholders to restore the management of such corporation to its board of directors and, (2) in the case of a previous deadlock on the board of directors or in its election, that a new board has been elected:*
"(a) In an action by a stockholder when it is established:

\* \* \*

"(2) That the acts of the directors or those in control of the corporation are illegal, oppressive or fraudulent; . . ." (emphasis supplied).

■ As we noted earlier the final decree of December 12, 1970, found White's conduct to be oppressive under the statute. Such a finding of fact by the chancellor hearing evidence *ore tenus* carries the weight of a jury verdict, and cannot be disturbed by us unless plainly wrong or without evidence to support it. *Price* v. *Martin*, 207 Va. 86, 88, 147 S.E.2d 716, 718 (1966); Code § 8-491.

■ Code § 13.1-94, suggested by the Model Business Corporation Act, ABA-ALI Model Bus. Corp. Act § 90 (1953), was adopted in its original form in 1956 in the general revision of the laws relating to corporations. Acts of Assembly, 1956, c. 428. The italicized language was added as an amendment in 1968. Acts of Assembly, 1968, c. 112.

Oppression as a ground for corporate dissolution would appear to be of fairly recent origin. The statutory recognition of this ground first occurred in Illinois in 1933. *Central Life Ins. Co.* v. *Davis*, 10 Ill. 2d 566, 572, 141 N.E.2d 45, 59 (1957). By 1965 at least eleven other states, including Virginia had adopted similar statutes. See 1965 Duke L.J. 128.

The word "oppressive," as used in the statute does not carry an essential inference of imminent disaster; it can contemplate a continuing course of conduct. The word does not necessarily savor of fraud, and the absence of "mismanagement, or misapplication of assets," does not prevent a finding that the conduct of the dominant directors or officers has been oppressive. It is not synonymous with "illegal" and "fraudulent." *Central Life Ins. Co.* v. *Davis*, *supra*; *Gidwitz* v. *Lanzit Corrugated Box Co.*, 20 Ill.2d 208, 215, 170 N.E.2d 131, 135 (1960).

The (British) Companies Act of 1948, 11 & 12 Geo. 6, C. 38, S. 210 permits relief to be granted to a stockholder where " . . . the affairs of the company are being conducted in a manner oppressive to some part of the members . . ." In this context it has been held that oppressive means ". . . a visible departure from the standards of fair dealing, and a violation of fair play on which every shareholder who entrusts his money to a company is entitled to rely." *Elder* v. *Elder & Watson, Ltd.*, (1952) Sess. Cas. 49, 55. It has also been held to mean " . . . a lack of probity and fair dealing in the affairs of a company to the prejudice of some of its members." *Scottish Co-op. Wholesale Society, Ltd.* v. *Meyer*, (1958) 3 All E.R.66, 86 (H.L.).

White, in his testimony, claimed his course of conduct represented an exercise of his best business judgment. He argues here, as he did below, that all of his acts were in the best interest of the company.

We find White's course of conduct susceptible to more than one interpretation. The chancellor heard the witnesses and observed their demeanor. We cannot say that his finding of oppressive conduct was plainly wrong or without evidence to support it, so the decree, in this respect, will be affirmed.

We must now deal with the alternative relief granted in lieu of dissolution by the trial court. As we noted earlier the chancellor directed the payment of a dividend, disallowed White's claim for rent, granted severance pay to Perkins and decreed that White's service station account be kept more current in the future.

Perkins, while contending that the trial court erred in not decreeing that the corporation be dissolved, argues that a court of equity has the inherent power to grant the relief it did. White, on the other hand, says that the court erred by invading the province of the board of directors in granting such alternative relief.

It is clear from the statute that the court, upon finding oppression, could have decreed dissolution. It is also clear that it could have appointed a custodian with power to continue the business, including the payment of dividends, if the chancellor was convinced from the evidence that this action was in the best interest of the stockholders.

While Code § 13.1-94 is remedial and should be liberally construed, we believe that the 1968 amendment clearly shows an intent by the General Assembly that the alternatives provided there are exclusive rather than inclusive. Having so found, it follows that the trial court erred in granting the relief which it did.

The decree, in this respect, is reversed and the case is remanded to the trial court for such further proceedings as may be appropriate consistent with this opinion.

*Affirmed in part, reversed in part and remanded.*