## Richmond

### LOUIS ADELMAN, ET AL. v. CONOTTI CORPORATION, ET AL.

April 28, 1975.

Record No. 740665.

Present, All the Justices.

*William H. King, Sr. (Gordon H. Rosser, Jr.; John W. Patterson; McGuire, Woods & Battle, on briefs), for appellants.*

*Alan G. Fleischer (Miles Cary, Jr.; Hirschler & Fleischer, on brief), for appellees.*

Harman, J., delivered the opinion of the court.

This is an appeal from a final decree in a stockholders' suit in which the trial court decreed cancellation of 80,000 shares of

common stock of Libbie Rehabilitation Center, Inc. (Libbie). These shares were issued at the direction of the Board of Directors of the corporation as part of an arrangement to finance an addition to Libbie's existing nursing home facility in Henrico County. The question for decision here is whether the trial court erred in its finding that a breach of fiduciary duty made the issuance of these shares void.

The appellants, who were the defendants in the trial court, are Libbie, its administrator (Herbert L. Seal) and its directors. The appellees here, who were the plaintiffs below, are Libbie stockholders who owned 106,267 common shares, or approximately 52% of the 203,854 shares of common stock of Libbie outstanding prior to March 17, 1973, the date upon which the Board of Directors of Libbie voted to issue 80,000 shares of common stock to Louis Adelman (Adelman) and Edward Hamway (Hamway), both of whom were directors of Libbie, in exchange for their guaranty of a loan by the Bank of Virginia to Libbie in the amount of $690,000.[1] The common stock of the corporation is the only class of stock vested with voting rights.

Of the 106,267 common shares owned by the plaintiffs prior to March 17, 1973, 34,000 shares were subject to a voting trust of which Adelman was the sole trustee. As a result of the trust, which was to expire on July 17, 1973, plaintiffs could exercise the voting rights in only 72,267 shares of their common stock, representing approximately 35% of the outstanding voting rights.

Prior to March 17, 1973, Adelman owned 55,000 common shares of Libbie and controlled the voting rights represented by 42,000 shares held by him as trustee. The other Libbie directors, on the same date, owned 19,200 shares of the common stock. Thus, Adelman and the other directors controlled the voting rights in 116,200 shares, approximately 57% of the total, the plaintiffs were entitled to vote approximately 35% of the outstanding shares, and the remaining shares were owned by others who are not parties to this proceeding.

---

[1] Of this sum, $500,000 represented new funds and $190,000, Libbie's existing indebtedness to The Bank of Virginia, was refinanced.

As we noted earlier, Libbie's purpose in obtaining the bank loan was to construct a 66 bed addition to its existing nursing home. The parties agree that good business judgment dictated additional construction to meet the demand for more beds than the corporation then had available. The proposed addition was first discussed before patients were received at Libbie's original facility in 1970. Libbie's board of directors, in December, 1971, instructed the administrator, Seal, to obtain information on the cost of building the proposed addition. In June, 1972, the board authorized Adelman, Libbie's president, to proceed with plans and financing arrangements for the construction.

Prior to the June, 1972, meeting of the Libbie board, Adelman had been in contact with a New York bank, which had provided the financing for Libbie's original facility, for the purpose of obtaining consolidated financing of Libbie's outstanding obligation to the bank and additional funds to erect the addition. Adelman had received a letter from the bank, dated April 10, 1972, in which the bank declined to extend further credit to Libbie on the ground that this would effect a release of the guarantors on Libbie's original obligation. In this letter, the bank stated:

> "In as much as there are new owners of the property, who have advised that they have insufficient financial strength to fully guarantee the amount of the increased loan, we shall be unable to consider an increase in our mortgage at the present time."

Most, if not all of the members of the board were aware of this letter when the board held its June, 1972, meeting. All of the directors were aware that the plaintiffs would have voting control of the corporation upon the expiration of the voting trust agreement in July, 1973, if no new common stock was issued prior to that date.

Alex Grossman, who was the principal owner of and an officer and director of one of the plaintiff corporations, a director of another of the plaintiff corporations and a joint venturer in F & L Associates, was a member of the board and was present at the meeting on June 1, 1972. At this meeting the minutes reflect that it was contemplated that guarantors would be required for the corporation to obtain additional financing and "Mr. Bennett would work up some figures for this based on the prior formula."

On August 9, 1972, the beneficial owners of the 42,000 shares in the voting trust, which included three of the plaintiffs in this proceeding, instituted suit in the Henrico County Circuit Court against Adelman, Libbie and the Libbie Board seeking, among other things, to terminate the voting trust on the ground that all beneficial owners of the shares, being *sui juris*, had the power to terminate the trust. On December 22, 1972, the trial court entered a decree denying relief on that ground.

After the refusal of the New York bank to rewrite and increase its loan, Adelman made application to The Bank of Virginia for a loan to finance construction of the addition. The Bank of Virginia, which then held a second mortgage on Libbie's property, approved this application. On September 26, 1972, Stuart L. Crenshaw, Jr., an assistant vice-president of the bank, wrote Adelman that the consolidated loan had been approved but that the bank would require "personal guarantees satisfactory to The Bank of Virginia of individuals whose combined net worth is two and one-half times the amount of the debt."

In late September or early October of 1972, Adelman and William F. Bennett (Bennett), an officer and director of Libbie, contacted Wheat, First Securities, Inc. (Wheat), a well-known brokerage firm, and requested Wheat to place a value on the shares of Libbie common stock. Wheat's representatives were told that Adelman and Bennett anticipated that shares of Libbie common stock would be issued to the guarantors of a loan to Libbie, that Adelman and Bennett were concerned over voting control of Libbie and that Adelman and Bennett would like the per share valuation of Libbie stock to be as low as possible. The Wheat representative who handled this transaction testified below. He said that Wheat's valuation was not influenced by the request for a low valuation. The broker valued Libbie common stock, which was closely held and not generally traded, at $1.78 per share in its report, dated January 3, 1973, to the Libbie Board.

In January, 1973, at the suggestion of the corporation's counsel who wished to avoid any question of a possible conflict of interest, the Libbie Board employed independent counsel and Adelman and Hamway employed independent counsel whose purpose was to negotiate the value of the guaranty required by The Bank of Virginia. The other members of the board were of the impression then, as they had been since being advised of the

loan commitment, that Adelman's guaranty was required by the bank.

Prior to the annual stockholders meeting on March 6, 1973, counsel for the plaintiffs, on February 19, 1973, wrote counsel for Libbie that he had reviewed the audited financial statement for Libbie's year ending on September 30, 1972. He mentioned a note in the financial statement which said:

"The Company has initiated plans to construct a 66 bed addition to its present facility. In connection with this proposed addition, the Company has obtained a loan commitment from a bank of $500,000.

"During the year the Board of Directors has authorized the payment to the President of the Company in the sum of $30,000, plus 5,000 shares of stock for his services in arranging and completing the proposed addition. The cash is to be paid at the rate of $2,000 a month until completion, at which time the unpaid balance and the stock will be issued."

Observing that it was his understanding that the plans for the 66 bed addition "have either been discontinued or are in a state of abeyance," plaintiffs' counsel questioned "the propriety of Louis Adelman's continuing to draw $2,000 a month or to receive all or any part of the 5,000 shares of stock."

One week later Libbie's counsel responded that "plans for the construction of a 66 bed addition to Libbie Rehabilitation Center, Inc., have not been discontinued, and that such plans are progressing with a view toward ultimate completion."

At the stockholders meeting of March 6, 1973, questions were directed to Adelman, who was presiding, about the building addition and the loan commitment. Adelman refused to answer these questions and referred his questioners to the corporation's counsel who was not present at the meeting. Alex Grossman, the only board member associated with the plaintiffs, was not reelected when directors were elected at that meeting.

Subsequent to the meeting, counsel for plaintiffs, by letter, submitted the questions raised at the stockholders meeting to the corporation's regular counsel. The corporation's regular counsel, by letter dated March 15, 1973, advised that Libbie's Board had retained special counsel in connection with the financing of the addition and suggested that such special counsel should be contacted.

On March 17, 1973, a special meeting of the Libbie Board was held. Those present, in addition to the directors, were Libbie's regular counsel, its special counsel and counsel for Adelman and Hamway. The minutes of that meeting reflect that Adelman, after advising the board that the bank had issued a commitment to make the additional $500,000 loan, told the board that the loan was to be secured by a second mortgage on Libbie's property. Adelman also advised the board that the bank would require "personal guarantees on the combined loan of individuals having an aggregate of at least $1,000,000 personal net worth."

The minutes go forward to relate:

"Mr. Adelman stated the directors and stockholders have long acknowledged that the expansion was highly desirable from the Corporation's point of view. He stated that his objective, as President of the Corporation, was to expand the facilities as had been so contemplated at as reasonable a cost as possible, and to make the stock of the Corporation readily marketable, which marketability would, of course, be for the benefit of all the stockholders.

"Mr. Adelman said that, if the Directors were favorably disposed towards entering into such a loan, he and Mr. Edward Hamway would be agreeable to giving such a guarantee on the following bases: Messrs. Adelman and Edward Hamway would (i) receive an aggregate of 29,400 shares of the Corporation's Common Stock as compensation for the guaranty risk, and (ii) receive 50,600 additional newly issued shares of the Corporation under a pledge as collateral for the Corporation's liability to the guarantors (approximately 13% of the exposure, based on a value of $1.78 per share of the Corporation's Common Stock) in the event they should be required to make payment to the Bank. Mr. Adelman explained that the latter requirement was essential, since, if a personal contingent liability on behalf of the Corporation were to be assumed in the amount of approximately $690,000, the guarantors would require some collateral to be realized on should they have to make payment to the Bank.

"Mr. Adelman, Mr. Edward Hamway and their counsel then left the meeting, and Mr. Bennett assumed the chair.

"Mr. Bennett, Treasurer of the Corporation, stated that the negotiations with Bank of Virginia had been protracted, and added that he believed the Bank's proposal was favorable to the Corporation. He noted that the 10% interest, plus the issuance of 29,400 shares of the Corporation's Common Stock to Messrs. Adelman and Edward Hamway as compensation for their agreement to guarantee the loan would result in an effective interest rate of approximately 11.3% per annum. Mr. Bennett further reported that all of the lending institutions with which he had been in contact had insisted upon personal guarantees.

"Mr. Bennett stated that he had contacted a number of southeastern financing institutions, and could report that even a 12% rate is a highly favorable one on a second mortgage of this type.

"Other sources had indicated a rate of at least 14% with personal endorsements. A considerable number of other sources had registered unwillingness to make such a loan at any interest rate.

"Mr. Bennett said he had also investigated the cost of a corporate guarantee bond. He distributed copies of a letter from Aetna Life and Casualty, dated January 24, 1973, stating that the annual rate for a financial guarantee bond would be $20 per $1,000, or $13,800 for $690,000, without sufficient collateral. Taking into account the expected curtailment during the initial seven years of the projected loan, the cost of a commercial bond would be approximately $81,000.

"Mr. Bennett then reviewed with the Board the appraisal made by Wheat First Securities, dated January 3, 1973, which report contained the opinion that the Corporation's Common Stock was then worth $1.78 per share. Mr. Bennett stated that, based on a per share price of $1.78, the cost of the guarantee bond ($96,000, reduced on account of curtailment of principal to $81,000) would equal 45,500 shares, as compared with the 29,400 shares being requested by Mr. Adelman and Mr. Edward Hamway."

The minutes then show that the board adopted formal resolutions fixing the value of Libbie's common stock at $1.78 per share and accepting the offer of Adelman and Hamway to act as guarantors on the loan.

The agreement between Libbie and Adelman and Hamway was formalized by the execution of the guaranty agreement involving 29,400 shares and the "pledge agreement" covering 50,600 shares on March 19. The 80,000 shares of Libbie stock were issued on the same day.

The deed of trust and note, dated March 21, securing the bank's loan were executed by Libbie's officers on March 23. The deed of trust was subsequently recorded in the office of the Clerk of Henrico County.

Plaintiffs did not learn of action taken at the March 17 board meeting and subsequent events until sometime in April. Promptly after gaining this information, four of the plaintiffs wrote to the Libbie Board and offered to provide the guaranty requested by the bank without cost to the corporation. The offer was ignored.[2] This suit was filed a short time later.

The trial court, after hearing four days of *ore tenus* testimony, found that Adelman, Hamway and the other members of the Libbie Board had breached their fiduciary duty to the other stockholders, which included the plaintiffs. On account of this breach of fiduciary duty, the trial court decreed that the 80,000 shares of Libbie stock issued on March 19, 1973, to Adelman and Hamway were void and that such shares be surrendered and cancelled.

Under Virginia law an officer of a corporation, in his dealings with the corporation, has the same duty of fidelity which arises in dealings between a trustee and a beneficiary of the trust. *Deford* v. *Ballentine Realty Corp.*, 164 Va. 436, 180 S.E. 164 (1935). Where a trustee deals with the *cestui que trust*, such transactions, while not *ipso facto* voidable, are *prima facie* presumed to be invalid and the fiduciary must bear the burden of proving that the transaction was fairly conducted. *Waddy* v. *Grimes*, 154 Va. 615, 153 S.E. 807 (1930).

In *Rowland* v. *Kable*, 174 Va. 343, 6 S.E.2d 633 (1940), we outlined the principles which apply to a director dealing with his corporation:

"The authorities are agreed that a director of a private corporation cannot directly or indirectly, in any transaction in

---

[2] Counsel, at oral argument, told us that the plaintiffs were still willing and able to provide this guaranty without cost to the corporation.

which he is under a duty to guard the interests of the corporation, acquire any personal advantage, or make any profit for himself, and if he does so, he may be compelled to account therefor to the corporation. This does not mean that he may not deal with his corporation or sell his property to the corporation if the transactions are open, fair and honest, and the corporation is represented by competent and authorized agents. The unbending rule is that the director must act in the utmost good faith, and this good faith forbids placing himself in a position where his individual interest clashes with his duty to his corporation. The purpose of the law is to secure fidelity in the director. If, in violation of the general rule, he places himself in a position in which he may be tempted, by his own private interest, to disregard that of the corporation, his transactions are voidable at the option of the corporation and may be set aside without showing actual injury." *Id.* at 366, 6 S.E.2d at 642.

We hold this same fiduciary duty applies to the conduct of the officers and directors of a corporation in their dealings with the corporation's stockholders.

■ We agree with the finding of the trial court, fully sustained by the evidence, that Adelman and Hamway breached their fiduciary duty to the plaintiffs. The defendant's contention that the agreement between Adelman and Hamway and Libbie was an arm's length transaction, and that it should be sustained, is, we think eloquently rebutted by the Chancellor, who found, in his letter opinion:

"The Board's action in proceeding with the 66 bed addition is undoubtedly a proper corporation function. Its financing was, of course, necessary. Upon the evidence presented in this case, it appears clear to me that a motive in the procedure which was decided upon was to assure that the group opposed to Adelman would not have a majority of the voting stock after the voting trust terminated on July 17, 1973. Does that motivation, clearly shared by at least five directors, and the circumstances under which the result was accomplished, void the issuance?

"At all material times in the development of the financing arrangements Adelman was the person in charge. He was the negotiator with the Greenwich Savings Bank and then

with The Bank of Virginia. After the voting trust case was filed in August, 1972, if not before, he was conscious of his opposition and naturally sought to overcome it. Adelman was aware of, and approved or participated in, the Wheat valuation and the negotiations beginning in late January, 1973, between counsel representing him and counsel representing Libbie. During those negotiations Adelman insisted on stock for his guaranty.

"At no time during this period of time did Adelman advise the holders of the voting trust certificates or the plaintiffs or other stockholders of what was being planned.

"From August, 1972, until March, 1973, there were two Board meetings, November 12th and January 9th. At neither meeting is there any reference in the minutes to the Wheat report or the proposed guaranty. No attempt was made to let the plaintiffs or other stockholders know what was going on or to contact them to see if they would consider a guaranty. This was deliberate — based upon what is shown to be the false assumption that some of the plaintiffs killed the Greenwich Savings loan. The repeated comment that Grossman was asked to guaranty is denied by him. Adelman's testimony that he would not have any of the plaintiffs as a co-guarantor supports Grossman's contention that he was never asked. In any event, Grossman never knew the details of what was planned.

"The fact that Libbie had, on many occasions in the past, gone to its directors or officers — including Grossman and Adelman — for guarantees or endorsements, without payment [of] any compensation cannot be ignored, though in view of the amount involved in this loan, that fact has little weight.

"On March 6, 1973, Adelman refused to answer a question put to him with respect to the details of the loan commitment. His response was that such information should be obtained through counsel. Adelman's fiduciary duty as trustee and as director is scarcely satisfied by such a response.

"Also, on March 6, 1973, the Board which — as Adelman certainly knew would be called upon to approve the details of the guaranty — was elected. Adelman, with his personal

and voting trust stock, chose the Directors. Grossman, for the first time in several years, was not on the slate.

"On March 17, 1973, the Board met. As of this time, no stockholders other than perhaps those on the Board had any knowledge of the proposed guaranty. Adelman, Hamway and counsel did withdraw from the meeting when the proposal was considered and approved. It was, of course, at this time that the Board approved the $1.78 per share valuation developed by Wheat.

"While I accept the Wheat valuation as objective, the fact remains that no stockholder member of the Board who accepted it had paid that little for his stock. Tokarz paid $7. in 1970, and had rejected a $3. offer later. Edward Hamway paid $7. in 1969 or 1970. The Steiners had rejected a bid of $2.50 or $3.00. There is no evidence of any sale at under $2 per share. Members of the Board testified they did not like the valuation — but no one suggested that it be increased. The condition of Libbie in March, 1973, was certainly as good as it had ever been. . . .

"Obviously, the interests of all stockholders of Libbie — except Adelman and Hamway — are served by a higher valuation.

"As to Adelman and Hamway, Adelman placed a value of $7 per share on his Libbie stock in his personal financial statement of May 21, 1973. . . . Hamway in a similar statement of May 25, 1973, lists 6,000 shares of Libbie at $48,000. . . . Hamway also testified that he did not try to get other endorsers because he did not desire competition.

"Not until April, 1973, did the present plaintiffs know what happened.

"This action is not between Libbie and Adelman, but is between a group of stockholders against Adelman, Board members and Libbie. Even though transactions between Adelman, Hamway and the Board might meet the arms length requirement this does not do away with the stockholders' right to have the actions measured against duties owing to them.

"While there was a valid business purpose for the loan and the financing, the method selected by Adelman, Hamway and the Board also had the following results:

"1. It served the personal interests of Adelman and Hamway.

"2. It deprived the plaintiffs of what would otherwise be a majority of the voting stock after July 17, 1973.

"3. It permitted the transfer of 29,400 shares of stock at $1.78 per share — a figure lower than any known sales in recent times and below the value that Adelman, Hamway, Tokarz and the Steiners placed on their own stock.

"4. It increased the amount of outstanding stock among which dividends would have to be distributed by fourteen percent.

"No efforts were made by the Board to see if other stockholders would provide this service for Libbie at a lesser cost. Reasons for this absence of effort were beliefs that Adelman was required by The Bank as an endorser (not established by the evidence), that the co-guarantor should be some one compatible with Adelman (difficult to sustain if the cost to Libbie could be thereby reduced) and that those hostile to Adelman should not be permitted to gain control (an improper consideration under the law).

"While the cases dealing with fiduciary duties do not often involve secrecy, that element is present here. There was a lack of disclosure and there was concealment by Adelman at the stockholders meeting of March 6, 1973."

Accordingly, we find no error in the trial court's finding that Adelman and Hamway violated their fiduciary duty to the plaintiffs and in its holding that the plaintiffs were entitled to rescission of the transaction between Libbie and Adelman and Hamway. This right to rescission, however, is subject to a condition precedent, for he who seeks equity must do equity.

■ After the court's letter opinion, the defendants filed a petition for rehearing in which they prayed ... "that the Court grant a rehearing on the question of acceptability to The Bank of Virginia of personal guarantees, not including the personal guarantees of Louis Adelman and Edward Hamway, that the Court make appropriate provision in its final decree for the substitutions of guarantors if such be acceptable to the said [b]ank, that the Court amend its findings of fact if such

substitution of guarantors not be acceptable to the said [b]ank, and that the Court grant such other and further relief as may be required in equity to avoid leaving the present guarantors jointly and severally obligated on a $690,000 obligation, without compensation for such risks, without pledge, protective covenants or other appropriate protection of their exposure, and with management of Libbie placed in the hands of those who are hostile to the present guarantors."

The court denied the requested rehearing, holding:

"The situation in which Adelman and Hamway found themselves is the consequence of their own actions. It is not the result of any offer the plaintiffs may have made during the trial of this case to substitute themselves for Adelman and Hamway. The court can neither require the plaintiffs to do so, nor require the [b]ank to accept."

A court of equity is always reluctant to rescind unless the parties can be put in status quo, *Dobie* v. *Sears, Roebuck & Co.*, 164 Va. 464, 474, 180 S.E. 289, 292 (1935), so we find that the Chancellor erred in his ruling in this respect. While The Bank of Virginia was not a party to this proceeding and subject to the court's direction, the plaintiffs were parties, having instituted the suit for rescission. The court, as a condition precedent to granting rescission, should have required plaintiffs to arrange to substitute themselves as guarantors if they were acceptable to the bank, or if not, to indemnify Adelman and Hamway, whose guaranty was used to obtain the loan, against any loss which Adelman and Hamway might sustain in the event of Libbie's subsequent default on its obligation to the bank.

We, therefore, reverse and remand with directions to the trial court that, as a condition precedent to granting rescission, the plaintiffs, if they are acceptable to the bank, be required to substitute themselves as guarantors for Libbie's loan, or, if the plaintiffs not be acceptable to the bank as substitute guarantors, that plaintiffs be required, within a reasonable time, and in a manner deemed satisfactory by the Chancellor, to indemnify Adelman and Hamway against any loss by reason of their guaranty on the loan to Libbie. Should the plaintiffs fail to satisfy one of the aforesaid conditions

within a reasonable time, the Chancellor is directed to deny rescission and dismiss plaintiffs' bill.

*Affirmed in part, reversed in part and remanded.*