## Frank R. Giannotti, et al.

## v.

## Alexander Hamway, et al.

Record No. 880555

January 12, 1990

Present: Compton, Stephenson, Russell, Whiting and Lacy, JJ., Poff, Senior Justice, and Gordon, Retired Justice

*Keith D. Boyette (Alan G. Fleischer; John C. Ivins, Jr.; Hirschler, Fleischer, Weinberg, Cox & Allen*, on briefs), for appellants.

*Martin A. Donlan, Jr. (Judith B. Henry; Crews & Hancock*, on brief), for appellees.

JUSTICE COMPTON delivered the opinion of the Court.

In this intracorporate dispute arising in a close corporation, we examine the correctness of the trial court's decision to order liquidation of the corporate assets and business.

Because this suit was filed in 1980, former Code § 13.1-94 (Repl. Vol. 1978) (now Code § 13.1-747) applies. As pertinent to the controversy, the statute provided:

"Any court of record, with general equity jurisdiction . . . , shall have full power to liquidate the assets and business of [a] corporation . . . :

(a) In an action by a stockholder when it is established:

. . .

(2) That the acts of the directors or those in control of the corporation are illegal, oppressive or fraudulent; or

. . .

(4) That the corporate assets are being misapplied or wasted."

After setting forth other provisions relating to judicial dissolution, the statute provided: "It shall not be necessary to make directors or stockholders parties to any such action or proceeding unless relief is sought against them personally."

In September 1980, appellees Alexander Hamway, Leroy Steiner, and Louis Adelman filed a bill of complaint against Libbie Rehabilitation Center, Inc. (Libbie), Frank R. Giannotti, Alex Grossman, Henry C. Miller, Ernest H. Dervishian, and Lewis T. Cowardin (defendants). The plaintiffs asserted that Libbie was a duly organized Virginia corporation and that the defendants were directors of Libbie holding the following offices: Giannotti - Chairman of the Board and Chief Executive Officer; Grossman - President; Miller - Vice President; Dervishian - Secretary and Corporate Attorney; and, Cowardin - Treasurer. The corporation was engaged in the development and operation of nursing homes.

The plaintiffs also asserted that the defendants, either individually or through corporations they controlled, owned or controlled a majority of the 209,054 shares of the then outstanding Libbie common stock. The plaintiffs also alleged that they were minority stockholders owning a total of approximately 74,500 shares of Libbie common stock.

The plaintiffs further asserted that defendants, by virtue of their positions as officers, directors, and majority stockholders, exercised complete control and domination over the corporate affairs and operations to the exclusion of the other stockholders, includ-

ing the plaintiffs. Elaborating, the plaintiffs alleged that the defendants "have engaged in numerous acts" which were "legally oppressive," and that the assets of Libbie have been "misapplied, divested and/or wasted."

The plaintiffs specifically charged defendants with authorizing and making payments from corporate funds to themselves for directors' fees and officers' salaries "grossly in excess of the value of the services they have rendered to Libbie." The plaintiffs also alleged that defendants had authorized and made payments to Dervishian for legal services rendered by him to Libbie "which payments were grossly in excess of the value of the legal services."

The plaintiffs also asserted that defendants had authorized and made contracts in which Grossman had a personal interest adverse to Libbie, relating to the purchase of supplies by Libbie. Plaintiffs alleged that these contracts were unfair to Libbie and were not conducted at arm's length, and that Grossman had gained a personal benefit and advantage at Libbie's expense.

Plaintiffs also charged that defendants, acting in bad faith, had "refused to declare dividends on Libbie common stock which, with due regard to the condition of the property and affairs of Libbie, should have been declared." Also, plaintiffs alleged that defendants had engaged in the borrowing and lending of corporate funds in a manner inconsistent with accepted and reasonable corporate practices.

Also, plaintiffs specified that defendants had authorized and engaged in the borrowing and lending of corporate funds in a wrongful manner which violated the fiduciary duties owed by them as officers and directors in control of Libbie to the remaining stockholders. Finally, plaintiffs asserted that defendants had mismanaged and misoperated the business of Libbie so that its licensing and certification was in jeopardy, and that its operations had become unprofitable.

Asserting that they were "unable to prevent the continuing oppression, . . . mismanagement, waste and self-dealing practiced by the defendants," plaintiffs asked the court, pursuant to Code §§ 13.1-94 and -95, to appoint a receiver pending the suit, to require defendants, "jointly and severally to restore to Libbie such funds as have been misspent or lost by Libbie as a result of their oppressive acts, and mismanagement, breach of fiduciary duty and improper self-dealing," and to "order the liquidation of the assets and business of Libbie."

The defendants filed a demurrer and answer to the bill, generally contending that the plaintiffs had not alleged any facts which would support their prayer for relief and specifically denying the allegations of wrongful conduct. Subsequently, the demurrer was overruled. In November 1982, the parties advised the court that the controversy had been settled. Efforts to consummate the settlement were unsuccessful. In 1984, defendants Miller and Dervishian died, and the personal representatives of their estates were substituted as parties defendant.

The trial eventually was held and the chancellor heard evidence ore tenus for 20 days from November 1985 to February 1986. The parties submitted proposed findings of fact and conclusions of law to the trial court in April 1986. The plaintiffs filed 265 proposals; the defendants filed 153. In November 1987, the chancellor announced his decision by letter opinion, finding in favor of the plaintiffs and ordering dissolution of the corporation. The trial court refused plaintiffs' request to order the defendants to restore certain assets to the corporation. These rulings were incorporated in a February 1988 final decree in which the court appointed a receiver to liquidate the corporate assets.

We granted the petition for appeal of defendants Giannotti, Grossman, Cowardin, and Dervishian's executrix, and suspended the judgment below pending appeal. Miller's estate did not participate in the appeal. We also granted the plaintiffs' assignments of cross-error.

An overview of Libbie's corporate history will set the stage for the details of the controversy. Incorporated in 1967, Libbie constructed a 130-bed nursing home facility in the Richmond metropolitan area. The facility opened in January 1970 under the name of Libbie Convalescent Center (Libbie Convalescent). This construction was under the direction of plaintiff Adelman, a majority stockholder at the time, who was president and a director of Libbie. Defendant Grossman was president of Libbie for brief periods in 1970.

In May 1970, defendants Giannotti, Miller, and Cowardin obtained their first ownership interest in Libbie through a corporation in which they had an interest with defendants Grossman and Dervishian. The latter corporation had operated a nursing home in the city of Richmond. Until June 1975, plaintiffs had a controlling interest in Libbie predicated upon a voting trust held by Adelman during much of the period between 1968 and 1975. During the

1970s, defendants began to acquire blocks of Libbie's common stock, directly and indirectly, and by 1973 had acquired enough stock to hold a majority interest in Libbie absent the voting trust, which was to expire in 1973.

In March 1973, the plaintiffs authorized issuance of 80,000 shares of common stock to Adelman and Hamway in return for their guaranty of a loan to Libbie. This enabled the plaintiffs to retain their majority interest in Libbie after the voting trust expired. The defendants filed suit attacking the transaction. This Court affirmed the trial court's judgment that the transaction be rescinded on the ground that Adelman and Hamway had violated their fiduciary duties to the stockholders. *Adelman* v. *Conotti Corp.*, 215 Va. 782, 793, 213 S.E.2d 774, 781 (1975). Voting control of the common stock then vested in the defendants. In June 1975, defendants, as majority shareholders, elected themselves as the directors and officers of Libbie, and have continued to retain voting control of the common stock of Libbie to the present.

At the time of trial, there were 209,054 shares of common stock issued with 8,200 shares being held in the treasury. Of the 200,854 shares of common stock held by shareholders, the plaintiffs, as a group, owned 37.09 percent, and the defendants, as a group, held direct or indirect interest in the ownership of 58.93 percent.

During 1975, Libbie completed construction, begun in 1973, of an addition to Libbie Convalescent, which provides both intermediate and skilled nursing care. From late 1975 to early 1977, Libbie built a nursing home facility in Tappahannock, through a wholly owned subsidiary, Phoenix Associates, Inc. Tappahannock Manor opened in January 1977 and provides intermediate nursing care to its residents. During 1977 and 1979, Phoenix built an addition to Tappahannock Manor. In April 1979, Libbie acquired the stock of Brent-Lox Hall Nursing Home, Inc. Brent-Lox, a wholly owned subsidiary of Libbie, operates a facility providing intermediate nursing care in Chesapeake. At the time of trial, Libbie, at its three facilities, operated a total of 443 beds and employed a total of 301 persons.

At trial, plaintiffs' main claim was that defendants had engaged in oppressive conduct within the meaning of the statute. This conduct involved three principal areas: excessive compensation; improper "related party transactions"; and inadequate dividends paid to stockholders.

The evidence relating to excessive compensation focused on officers' salaries, directors' fees, bonuses, expense allowances, and other payments, all authorized by the recipients. The evidence of improper related party transactions involved dealings between Libbie and entities related to or controlled by defendants. For example, plaintiffs presented evidence that Libbie used as vendors or suppliers entities such as Cowardin's jewelry company and Aladdin Tile and Carpet Company, in which Giannotti had a financial interest. In addition, the plaintiffs attacked Libbie's practice of using attorney Dervishian as general counsel when he was a salaried officer of the corporation and of permitting him to charge a fee based on an hourly rate for performing work to discharge his duties as corporate Secretary.

The plaintiffs' evidence of inadequate dividends showed that from June 1975 through September 30, 1985, defendants' compensation totalled $2,799,006 while during the same period the plaintiffs received $50,000 of $132,000 in common stock dividends. The plaintiffs showed that after-tax profits during the period amounted to $1,042,350 which, according to plaintiffs, meant that for every dollar of profit earned, defendants received $2.67 in compensation. This comparison, the plaintiffs urged, did not take into account an additional $1.4 million attributable to unnecessary loan and interest costs incurred in order to enable those payments to be made to defendants. The plaintiffs claimed that when profits are compared to the total cost of compensation, the ratio of compensation to profits is 4 to 1.

At trial, defendants presented evidence in an attempt to counter plaintiffs' claims. For example, defendants claimed they had been successful in managing the corporate affairs during the period from 1975 to 1985. They established that total corporate assets increased from $1.7 million to $6.4 million during the period; total operating revenues increased from $1.5 million to $6.8 million; retained earnings increased from about $182,000 to approximately $922,000; common stockholders' equity rose from about $602,000 to near $1.3 million; and net income after taxes increased from $89,473 to $191,407.

In addition, defendants offered evidence to establish that defendants were actively involved in all aspects of the corporate business continually from the time they acquired control to the time of trial. According to defendants' evidence, each took responsibility for specific areas of corporate management. For example, Gi-

annotti claimed to have been involved thoroughly in development and implementation of basic objectives, policies and operating plans for the business; analyzing operating results and directing appropriate action to correct unsatisfactory conditions; establishing limits of authority for personnel; and representing Libbie in relationships with clients, suppliers, competitors, governmental agencies, and professional groups.

Further, according to defendants, their involvement included activities to expand the services and operations of Libbie, including evaluating and investigating purchase of additional nursing homes in various parts of the Commonwealth. Examples of additional involvement, according to defendants, were efforts to keep Libbie Convalescent operating when confronted with a labor dispute which arose in 1978 resulting in a strike in April 1979. Also, defendants presented evidence of their intense involvement with financial planning and auditing of each of the three facilities.

In essence, defendants presented evidence to show that their compensation was reasonable, proper, and appropriate, given their personal, individual attention to corporate affairs and the resulting success of their efforts. They offered evidence to show that the market value of Libbie's stock had appreciated substantially in value during the time of their control. Additionally, they sought to establish that the transactions with related parties were fair to Libbie and that the services rendered cost less than would have been paid if unrelated parties had been hired to do the work.

In the course of his letter opinion ruling against defendants, the chancellor expressly set forth certain findings of fact gleaned from the evidence, which was in conflict on almost every issue. In other portions of the opinion, the trial court incorporated by reference proposed findings submitted by the parties. While referring to proposals by number in many instances, the court stated that it adopted "plaintiffs' proposed findings of fact and conclusions of law which are not inconsistent with this opinion."

The trial court found "that plaintiffs have borne their burden as to the substance of their claims," relying principally on the testimony of the administrators of each of the three Libbie facilities "as most telling regarding the lack of sufficient work and supervision to justify officer salaries, fees and other benefits." The court further found that "plaintiffs have sufficiently proved matters in connection with related party transactions," except for one aspect of that issue, which involved pricing of medicine used at Libbie

Convalescent supplied by a Richmond pharmacy in which Grossman had an interest.

Finally, the chancellor made the specific finding "that defendants by their actions have been oppressive to the minority plaintiff shareholders in breach of their fiduciary duties in their capacity as majority controllers of the corporation by effectively freezing out plaintiffs from a reasonable opportunity to receive a reasonable return on their investment given the financial condition of the corporation during the period."

On appeal, defendants assign error to the trial court's action in finding the compensation excessive, in finding they breached their fiduciary duties in the related party transactions, in finding their conduct constituted oppression, and in ordering liquidation. Plaintiffs assigned cross-error to the refusal of the court to order defendants jointly and severally to restore to the corporation the funds which they had improperly caused Libbie to expend as a result of their oppressive conduct. Plaintiffs also assigned cross-error to denial of their request for an award of attorney's fees and expenses, and to denial of their motion made after the ninth day of trial to amend their bill of complaint.

■ The principles of law applicable are not in dispute. The standard of appellate review is governed by statute. When a case is decided by a court sitting without a jury and, as here, a party objects to the decision on the ground that it is contrary to the evidence, the judgment of the trial court will not be set aside "unless it appears from the evidence that such judgment is plainly wrong or without evidence to support it." Code § 8.01-680. When a chancellor, hearing evidence ore tenus, makes a finding of oppressive conduct under Code § 13.1-94, such a finding carries the weight of a jury verdict as in other cases. *White* v. *Perkins*, 213 Va. 129, 134, 189 S.E.2d 315, 319 (1972). Where, as here, oppressive conduct and misapplication or waste of corporate assets are charged, the plaintiff's burden is to prove the allegations by a preponderance of the evidence. *Baylor* v. *Beverly Book Co.*, 216 Va. 22, 24, 216 S.E.2d 18, 19 (1975).

■ As used in § 13.1-94, "oppressive" means conduct by corporate managers toward stockholders which departs from the standards of fair dealing and violates the principles of fair play on which persons who entrust their funds to a corporation are entitled to rely. The term does not mean that a corporate disaster may be imminent and does not necessarily mean fraudulent conduct. In-

deed, "oppressive" is not synonymous with the statutory terms "illegal" or "fraudulent." The term can contemplate a continuous course of conduct and includes a lack of probity in corporate affairs to the prejudice of some of its shareholders. *White*, 213 Va. at 134, 189 S.E.2d at 319-20.

A corporate officer has the same duties of fidelity in dealing with the corporation that arise in dealings between a trustee and a beneficiary of the trust. *Adelman*, 215 Va. at 789, 213 S.E.2d at 779. Thus, "a director of a private corporation cannot directly or indirectly, in any transaction in which he is under a duty to guard the interests of the corporation, acquire any personal advantage, or make any profit for himself, and if he does so, he may be compelled to account therefor to the corporation." *Rowland* v. *Kable*, 174 Va. 343, 366, 6 S.E.2d 633, 642 (1940). And, when transactions have occurred between fiduciaries and those to whom they stand in such relation, the burden of proof lies upon the persons who fill the position of trust and confidence to show that the transaction has been fair. *Waddy* v. *Grimes*, 154 Va. 615, 648, 153 S.E. 807, 817 (1930).

This burden-of-proof principle is an exception to the business judgment rule which limits the power of courts in reviewing the internal management of corporate affairs. *See Gottlieb* v. *Economy Stores*, 199 Va. 848, 857, 102 S.E.2d 345, 352 (1958). Under this rule, directors are presumed to have acted properly and in good faith in the exercise of their business judgment, including the fixing of compensation, "and are called to account for their actions only when they are shown to have engaged in self-dealing or fraud, or have acted in bad faith." *Treadway Companies* v. *Care Corp.*, 638 F.2d 357, 382 (2nd Cir. 1980).

Courts are hesitant to question the reasonableness of a corporate officer's compensation when it is set by a disinterested board. *Wilderman* v. *Wilderman*, 315 A.2d 610, 615 (Del. Ch. 1974). However, as in this case, where the directors of a close corporation elect themselves as officers and set their own salaries, and they are all accused of combining to fix excessive salaries for each other, it is impossible to have a "disinterested board." *Id.*

Further, when a plaintiff "demonstrates that a director had an interest in the transaction at issue, the burden shifts to the director to prove that the transaction was fair and reasonable to the corporation." *Treadway Companies*, 638 F.2d at 382. In defendants' words, they "have not contested in this appeal that the

ultimate burden of proof lies with them on the issue of the reasonableness of compensation."

Against the background of these settled principles, our study of this record convinces us that the chancellor's findings of fact are neither plainly wrong nor without evidence to support them. Indeed, there is abundant, credible evidence to support the trial court's conclusions that defendants engaged in oppressive conduct and that they misapplied and wasted corporate assets.

We view this highly conflicting evidence in the light most favorable to the plaintiffs, according to established principles of appellate review. In doing so, we do not overlook the repeated findings, incorporated by reference into the chancellor's opinion, of the lack of credibility of defendants Giannotti, Grossman, and Cowardin. For example, the court found on one issue of fact that "the defendants' position is at best so much self-aggrandizement." The court, commenting on another issue, found Giannotti's testimony "incredible" and determined that he "falsified Libbie records in at least one instance to cover up his transactions." On another issue, the court found Giannotti to be "totally evasive." Also, the court found Cowardin's testimony on another issue "less than credible," and found that "Grossman's testimony is not totally credible," assigning a number of reasons.

Regarding the issue of excessive compensation, the parties agree upon the factors to be considered in judging reasonableness. They include qualifications of the employee; the nature, extent, and scope of the employee's work; the type of services rendered; the difficulties involved in discharging responsibilities; success of the business; comparison between salary paid to the corporation's net income; comparison of compensation paid to comparable officers in other companies; and similar relevant factors.

The following chart, based on defendants' computations, shows the total compensation received by defendants in salaries, bonuses, and directors' fees during the fiscal years ending September 30 for the management of the three facilities:

|  | Giannotti | Grossman | Miller | Dervishian | Cowardin |
|---|---|---|---|---|---|
| 09/30/75 (4 mos.) | 7,870 | 6,449 | 5,860 | 6,449 | 6,399 |
| 09/30/76 | 39,056 | 27,699 | 17,350 | 25,198 | 24,998 |
| 09/30/77 | 41,305 | 25,916 | 21,183 | 24,916 | 27,764 |
| 09/30/78 | 57,989 | 31,695 | 31,495 | 31,695 | 39,057 |
| 09/30/79 | 60,278 | 32,026 | 32,276 | 32,276 | 39,968 |
| 09/30/80 | 96,341 | 50,784 | 50,259 | 50,784 | 63,189 |
| 09/30/81 | 85,773 | 45,087 | 44,762 | 45,137 | 56,514 |
| 09/30/82 | 86,095 | 45,361 | 45,361 | 44,861 | 56,397 |
| 09/30/83 | 85,968 | 45,237 | 44,487 | 44,487 | 56,642 |
| 09/30/84 | 87,338 | 45,855 | 27,184 | 29,090 | 56,976 |
| 09/30/85 | 119,425 | 45,247 | -- | -- | 78,127 |

The defendants came to the Libbie enterprise with few qualifications to operate a nursing home. Giannotti had been a carpet and tile retailer, Grossman a pharmacist, Miller a retired real estate developer, Dervishian a lawyer, and Cowardin a retail jeweler. While Giannotti and Dervishian had operated a small nursing home in the city of Richmond for a while before becoming associated with Libbie, none of the defendants, either by education or training, had any expertise in the operation of nursing homes.

The nature, extent, and scope of defendants' work in attending to corporate affairs were very limited. Giannotti was the main actor in directing the affairs of Libbie, although he principally was involved in approving administrators' decisions regarding the day-to-day operation of the facilities. While Grossman received compensation from all three facilities, his activities were limited almost exclusively to Libbie Convalescent. Miller had few work responsibilities. Dervishian's role was limited. He was a friend and advisor of Giannotti, but his corporate responsibilities were duplicated by his assignments as general counsel. Cowardin, Libbie's finance officer, demonstrated no knowledge of the Medicare and Medicaid programs, the principal sources of Libbie's income. While he claimed to have spent 20-25 hours per week on his corporate duties, about 50 percent of a normal 40-hour work week, Cowardin reported on tax returns for his jewelry business that he spent 90 percent of his working time in that business for its fiscal years ending in 1978 and 1979; 80 percent of his time

during fiscal 1980, 1981, and 1983; 75 percent of his time during fiscal 1984; and 40 percent of his time in 1985. From the standpoint of hours worked for Libbie, defendants were part-time employees with significant outside business interests.

The difficulties of the business can justify officers' and directors' compensation. But, the complexities of nursing home operation were handled by the administrators of Libbie's facilities. The respective parties offered expert testimony on the reasonableness of the compensation, which included comparisons with amounts paid to officers in similar businesses. The credibility of defendants' main expert was challenged, and the trial court accepted the opinion of one of plaintiffs' experts that "the work that was performed was not of sufficient scope and complexity to justify the salary, bonuses, fringe benefits and other compensation which was paid to these individuals." According to another plaintiffs' expert, five men were performing management functions that could have been performed by one individual.

Defendants rely heavily on Libbie's purported success in attempting to convince us that they sustained their burden of proving that the compensation was reasonable. The defendants offered evidence comparing their salary and efforts with two other nursing homes in Central Virginia. The comparison showed, however, that Libbie has not been operated profitably by the standards of the other homes upon which defendants relied. During the period of 1980 to 1985, the average, before-tax profit per bed was $2,009 in one case and $2,975 in another. During the same period, Libbie's profits were $1,107 per bed. The trial court was justified in finding, under the evidence as a whole, that Libbie would have been more profitable except for the excessive compensation extracted from the corporation by defendants.

Turning to the chancellor's finding that defendants breached their fiduciary duties in certain transactions, we note defendants' contention that a person may deal with the corporation of which he is a director or officer and sell property to it provided the transaction is open, fair, and honest, and the corporation is represented by competent and authorized agents, citing *Rowland*, 174 Va. at 366, 6 S.E.2d at 642. In view of the trial court's findings, however, defendants have failed to carry their burden of proving the fairness and propriety of the following transactions. A tile company in which Giannotti had a financial interest and a jewelry company in which Cowardin had an interest both dealt

with Libbie. And, Dervishian's legal fees were shown to be for work done in the course of performing his responsibilities as corporate attorney.

Having concluded that the chancellor did not err in finding defendants guilty of oppressive conduct, which involved misapplication and waste of corporate funds, including failure to pay adequate dividends, we turn to the correctness of the relief awarded below. Defendants argue that the "corporate death penalty" should not be imposed on a viable, solvent corporation.

As the trial court recognized, courts generally should be reluctant to order liquidation of a functioning corporation at the instance of minority stockholders. However, the General Assembly has cloaked courts of equity with, in the words of the statute, "full power" to liquidate in a proper case where oppressive conduct has been established. The remedy specified by the legislature, while discretionary, is "exclusive," and does not permit the trial court to fashion other, apparently equitable remedies. *White*, 213 Va. at 135, 189 S.E.2d at 320. *See Baylor*, 216 Va. at 24, 216 S.E.2d at 19. Because the trial court's finding of oppression in this case is not plainly wrong or without evidence to support it, we cannot say, under these circumstances, that the court abused its discretion in decreeing dissolution. The defendants' conduct was egregious, domineering, blatantly unfair, and prejudicial to the plaintiffs. This is a well-documented case of "harsh and long-continued oppression," 1 F. O'Neal & R. Thompson, *O'Neal's Oppression of Minority Shareholders*, § 3:08 at 66 (2nd ed. 1985), in the words of one leading commentator.

This brings us to the assignments of cross-error. Plaintiffs contend that the trial court erred in refusing to require defendants to restore corporate funds which the court found the defendants had misapplied or wasted. They point to their specific request for such relief in the bill of complaint and argue that it is authorized in this suit by the statutory provision, "It shall not be necessary to make directors . . . parties to any such action or proceeding unless relief is sought against them personally." They also argue that, in overruling defendants' demurrer, the trial court implicitly recognized that plaintiffs could prosecute what amounts to a stockholders' derivative suit in a proceeding for dissolution under § 13.1-94. We do not agree.

This issue has been decided in *White* v. *Perkins*. There, the trial court, in a § 13.1-94 proceeding, granted alternative relief in

lieu of dissolution. The court directed payment of a dividend, disallowed a claim for rent, granted severance pay, and ordered an account of the business to be kept more current in the future. Affirming the trial court's finding of oppressive conduct, we reversed the court on the remedy issue. We said that the statute clearly provided for dissolution upon a finding of oppression, as well as for appointment of a custodian with power to continue the business, including payment of dividends, if the court was convinced that such action was in the best interests of the stockholders. We said, however, that those alternatives were "exclusive rather than inclusive." 213 Va. at 135, 189 S.E.2d at 320. We remanded the case for fixing of a proper remedy.

Accordingly, we hold that the trial court did not err in refusing to require restoration of funds at this stage of the proceeding. Former Code § 13.1-95 (1978 Repl. Vol.) (now, in substance, § 13.1-748) prescribes the procedure to be employed after dissolution has been decreed under the judicial dissolution statute and allows the liquidating receiver to maintain suits in his name as receiver of the corporation. Indeed, the final decree in this case empowers the receiver "to institute and prosecute all suits as may be necessary . . . to collect the . . . obligations due to Libbie." And, defendants represent on brief that this receiver, relying on the trial court's findings of excessive compensation and improper related party transactions, instituted an action against them in May 1988 seeking to recover certain sums.

In addition, former Code § 13.1-101 (1978 Repl. Vol.) (now § 13.1-755) provides that dissolution of a corporation "shall not take away or impair any remedy available to . . . such corporation, its directors, officers or stockholders, for any right or claim existing or any liability incurred, prior to such dissolution." Therefore, the statutory scheme provides ample means for further relief to oppressed minority stockholders where, as here, the minority has employed the judicial dissolution statute and its "exclusive" remedies.

In view of the foregoing, it follows that the court properly refused to award attorney's fees and expenses because the statute does not authorize them in the dissolution phase of a case of this kind. Additionally, we conclude that the trial court did not abuse its discretion in refusing to allow amendment of the bill of complaint in the midst of trial to include, in effect, a stockholders' derivative suit among the claims for relief.

Accordingly, we hold that the assignments of cross-error have no merit.

For these reasons, the final decree of the trial court will be affirmed and the cause will be remanded for the court to supervise the liquidation as provided in its decree.

*Affirmed and remanded.*

RETIRED JUSTICE GORDON, dissenting.

To liquidate the corporation is to kill the goose that laid the golden egg. The history, as shown by the record, since the individual defendants assumed control proves the point:

| Financial Data | 1975 | 1985 | Percentage Increase |
|---|---|---|---|
| Total Assets | $ 1,720,076 | $ 6,392,997 | 272% |
| Current Ratio | 1.31 | 2.64 | |
| Total Operating Revenues | 1,514,686 | 6,807,902 | 349% |
| Retained Earnings | 181,984 | 922,473 | 406% |
| Common Stockholders Equity | 602,363 | 1,274,851 | 112% |
| Book Value of Common Stock | 2.41 | 5.85 | 143% |
| Net Income Before Taxes | 150,000 | 330,000 | 222% |
| Net Income After Taxes | 89,473 | 191,407 | 114% |

During the period, the corporation opened additional facilities, requiring the expenditure of substantial sums. Bed capacity increased from 195 to 443.

Neither the corporation nor the plaintiff-stockholders have suffered from oppressive actions by the defendants. The record discloses that the plaintiff-stockholders have suffered only the usual and legal burdens borne by minority stockholders.

The complainants rely on the individual defendants' failure to declare dividends as a ground for liquidation. In *Penn* v. *Pemberton & Penn*, 189 Va. 649, 53 S.E.2d 823 (1949) (affirming

the trial court's refusal to order liquidation under a statute then in force), the Court said:

> The general rule is that in the absence of a special contract or statute the board of directors, in its discretion, determines whether to declare dividends on the stock, or to apply the earnings and surplus to operating capital, or to some other corporate purpose. If the directors act in good faith, a court of equity usually will not interfere with the exercise of their discretion. However, if the action of the board in refusing to declare a dividend when there are sufficient earnings or surplus not necessarily needed in the business, is so arbitrary, or so unreasonable, as to amount to a breach of trust, such action is subject to judicial review. "If there is any doubt about the propriety of declaring dividends, the directors are justified in resolving the doubt against such action. Ordinarily, the stockholders have no power to control the directors in the exercise of their discretion in determining whether they will declare a dividend."

*Id.* at 658-59, 53 S.E.2d at 828 (citations omitted). The complainants' remedy here (if any) is the enforced declaration of a dividend, not liquidation. But in view of the expanded corporate business and finances, the record does not support even that remedy.

If the corporation has suffered any actionable injury at the hands of the individual defendants (which I doubt the record in this case supports), the remedy lies in a stockholders' derivative suit.

I would reverse the decree and dismiss the bill of complaint.