## CIRCUIT COURT OF ROCKINGHAM COUNTY

William S. Stickley

v.

Dan C. Stickley, Jr.,
and J. O. Stickley & Son, Inc.

July 22, 1997

Case No. (Chancery) 15348

BY JUDGE JOHN J. MCGRATH, JR.

> Hence jarring sectaries may learn
> Their real int'rest to discern;
> That brother should not war with brother,
> And worry and devour each other;
> But sing and shine by sweet consent,
> Till life's poor transient night is spent,
> Respecting in each other's case
> The gifts of nature and of grace.

William Cowper, *The Nightingale and Glowworm* (1782).

### I. *Introduction*

In its simplest form, this is a suit by a minority shareholder owning 35% of the stock of J. O. Stickley & Son, Inc. ("hereinafter JOSI") requesting that the Corporation be dissolved and its affairs wound up pursuant to § 13.1-747 of the Code of Virginia, or, in the alternative, that a sale of virtually all of the corporate operating assets in 1995 be determined to be a sale of substantially all of the corporation's property pursuant to §§ 13.1-724 and 13.1-730 of the Code of Virginia, thus entitling the plaintiff as a minority shareholder to an appraisal and a redemption of his stock.

In reality, this is one of at least five fratricidal law suits between the only two sons and heirs of Dan Stickley, Sr., who died testate in Rockingham County on May 4, 1995. Since the death of the elder Mr. Stickley, his two sons have been engaged in non-stop litigation on subjects ranging from the operation of the family businesses, the operation of the family farms, Dan Stickley, Jr.'s activities as a fiduciary while operating under a durable power of attorney executed by his father, and various aspects of apportioning bequests and tax liabilities in the administration of the estate of which the two brothers are co-executors. In addition, it appears that one or more approaches have been made to the authorities by William Stickley seeking to have an indictment or other criminal process filed against his brother.

This sad story of the disintegration of the family of Dan Stickley, Sr., is to be paraded in public because his two sons, seeming to act out some biblical imperative or Greek tragedy, have turned their sordid family disputes into matters of public record. The Court sitting in this case and in related cases has sat through at least seven days of live testimony from, *inter alia*, virtually every member of the Stickley family in addition to countless lawyers, accountants, and financial experts. This does not even include the dozens of depositions that have been taken of the parties and their various retainers.

The animosity between the two brothers (in spite of the amazing fact that they live in adjoining farm houses which are only 300 feet apart) is palpable when they are in the same room. It does not escape the Court's attention that these two grown and ostensibly mature men can barely look each other in the eyes when they are in the same room. Although not as severe, it appears that the children and spouses of the two principal antagonists have also joined the fray.

Some general background of this once proud family is in order to explain the situation in which it now finds itself. Daniel C. Stickley, Sr., was a prominent Rockingham County businessman, farmer, and civic leader. For a number of years, he and his father, J. O. Stickley, operated a large and successful farm equipment distributorship known as J. O. Stickley & Son, Inc. (JOSI). Dan Stickley, Sr., had only two children: Dan Stickley, Jr., age 65, and Dr. William Stickley, age 63.

The two sons of Dan Stickley, Sr., took two entirely distinct paths in making their fortunes. Dan, Jr., the oldest son, graduated from Washington and Lee University and after a stint in the military returned to Rockingham County, in the 1950's, lived on one of his father's farms, and worked with his father in the family farm implement business. From the evidence, it is clear that the plan was for Dan Stickley, Jr., to take over and operate the family businesses upon the retirement or death of his father.

The second son, William Stickley, graduated from the Virginia Military Institute and the Bowman Gray School of Medicine at Wake Forest, became a board certified anesthesiologist and businessman living on the Eastern Shore of Virginia and in Winchester, Virginia. Although Dr. Stickley was a substantial minority shareholder in JOSI and served on its Board through 1992, he was never very active in the family businesses while he lived away from Rockingham County and pursued his medical career and other business opportunities.

This appeared to be the *status quo* until approximately 1985 when Dr. Stickley received a call from his father stating that he wanted Dr. Stickley to return to Harrisonburg to help run the family farms and business because Dan Stickley, Jr., had apparently had a feud with his father and had threatened to leave the family business. When Dr. Stickley contacted his brother to find out what was going on, he was informed by Dan Stickley, Jr., to "mind your own business."

The testimony is in conflict and very confusing as to what exactly happened in this period, but the upshot was that Dr. Stickley and his family moved back to the family farm in Rockingham County in approximately 1986. In fact, this move was accomplished by Dan Stickley, Jr., and his family being moved out of the main house on the "Conger" farm and taking up residence in the smaller farm house on the MacInturff farm.

The relationship between the Stickley brothers rapidly deteriorated from 1986 onward. Dr. Stickley took over operations of the three family farms while continuing to practice medicine on a part time basis in Norfolk and Harrisonburg. Dan Stickley, Jr., continued to operate JOSI as the *de facto* Chief Executive Officer. Although Mr. Stickley, Sr., was apparently *compos mentis* up to his death, he went into the Sunnyside Nursing home in 1989 and remained there until his death in 1995. At or about the time Mr. Stickley, Sr., entered the nursing home, his son Dan, Jr., started exercising the Durable Power of Attorney his father had executed in his favor in 1982.

From approximately 1992 until the death of Mr. Stickley, Sr., in 1995, the relationship between the two sides of the family steadily deteriorated with their dealings principally being between their respective armadas of lawyers, accountants, tax advisors, etc. The Court alone is aware of at least five law firms and four accounting firms that have been involved in this maelstrom of litigation.

Once Dan, Sr., died, the public hostilities began in earnest with the filing of numerous lawsuits. The Court held a three day hearing in this case on December 27, 30, and 31, 1996. In addition, this Court held another *ore tenus* hearing involving these parties in a related fiduciary accounting suit which

lasted for three days and produced approximately 1,000 pages of transcript and one foot of exhibits.

## II. *Findings of Fact*

The 1911 Charter of J. O. Stickley & Son, Incorporated ("the Corporation") still in effect, (Jt. Ex. 1), states the following purposes:

C. The purposes for which it is formed are to conduct a general Merchandise business, especially to buy and sell, by wholesale and retail Agricultural Implements, Machinery, Fertilizers, Lumber, and Hardware, and to act as Agents for others, and handle on commission such articles as the Board of Directors may determine and to conduct a general construction and repair shop.

The 1911 By-laws of the Corporation, effective until December 4, 1992, (Jt. Ex. 2), contained the following provisions:

### Article III. Directors

1. The Board of Directors shall consist of five persons (including the President of the Corporation) who shall be stockholders and who shall be elected by the stockholders at their annual meeting to serve for the ensuing year or until their successors are elected and qualified.

### Article IV. Officers

4. The Treasurer shall ... at all reasonable times exhibit his books and accounts to any directors or stockholders of the Company, upon application at the offices of the Company during business hours, and perform such other duties as the Board of Directors may reasonably require.

The Corporation engaged in its business at 600 East Market Street, Harrisonburg, Virginia. (Pl.'s Ex. 28.) For many years, JOSI held two franchises for agricultural equipment, Case International and New Holland. (Transcript of Trial Proceedings, December 27, 30-31, 1996, (hereinafter "Tr."), 94.) It also sold Kubota, Cub Cadet, and Toro tractors and garden equipment as well as home appliances plus it had a small shop for equipment repair. (Tr. 33, 67-68.)

For many, many years until 1989, Daniel C. Stickley, Sr., was the President of the Corporation, and his son William S. Stickley ("Dr. Stickley," plaintiff herein) was Vice-President, and his son Daniel C. Stickley, Jr., ("Dan, Jr.," individual defendant herein) was Secretary/Treasurer. They were the only members of the Board of Directors. (*See, e.g.,* Pl.'s Ex. 31A-C; Tr. 191.) However, Dr. Stickley's involvement was not on a day-to-day basis.

Officially, Mr. Stickley, Sr., retired from active participation in the Corporation late in 1989 when he went to live at Sunnyside Retirement Home. (Jt. Ex. 3-S/1990.) However, he had been less and less active since approximately 1986 when Dan, Jr., took over the main office at the company's headquarters and left his father without an official office. After this event, Dan Stickley, Sr., only occasionally returned to the store. (Tr. 195, 480-81.)

Dr. Stickley and Dan, Jr., and his family derived all their shares in the Corporation from Mr. Stickley, his wife, and his father, J. O. Stickley, as gifts, except for a few that Dan, Jr., purchased in the 1950's. (Tr. 186-187.) Dan, Jr., agreed with his father's decision to give his brother 35% of the Corporation. (Tr. 52-53.) In 1985, Mr. Stickley transferred the bulk of his shares to his two sons. Dan, Jr., was to get the remaining shares under Mr. Stickley's will, but those were gifted to Dan, Jr.'s daughters, Barbara, Carolyn, and Mary. Mr. Stickley, Sr.'s final 25 shares were gifted by Dan, Jr., as attorney-in-fact for his father to his three daughters in 1992. (Pl.'s Ex. 33 and 39; Tr. 451.)

Since approximately 1992, the ownership of the outstanding 1314 shares in JOSI has been:

Dan C. Stickley, Jr., 614 shares
Dr. William S. Stickley 460 shares
Julia Stickley (wife of Dan, Jr.) 70 shares
Barbara Stickley Miller (daughter of Dan, Jr.) 57 shares
Carolyn Stickley Bragg (daughter of Dan, Jr.) 57 shares
Mary Stickley (daughter of Dan, Jr.) 56 shares

Dr. Stickley owns 460 shares or 35% of the outstanding shares, and Dan, Jr., and his immediate family own the remaining 65%.

Until Dan Stickley, Sr., stopped attending the meetings in 1989, Dr. Stickley received an annual salary of $5,000 for his services as Vice-President. (Pl.'s Ex. 31-A; Tr. 191.) Dan, Jr., apparently resented his father giving Dr. Stickley this benefit since Dr. Stickley was not engaged in the day to day affairs of the Corporation. (Tr. 191, 925, 936.)

The policy of the Corporation was not to pay any dividends to avoid double taxation. (Tr. 921-22.) The policy was to pay a bonus or salary to

directors and/or officers. Thus, a stockholder who had no position as director, officer, or employee would not be eligible for a benefit. (Tr. 923-24.) This is essentially what happened to Dr. William Stickley when he was ousted from the Board in 1992. The corporation did not pay dividends even in years where it had significant earnings.

In 1987, the Corporation bought the assets of Carey Ford in Staunton, Virginia, and combined its branch in Staunton into a newly formed subsidiary known as Stickley's, Inc. (hereinafter "SI"). (Tr. 34, 36, 65.) JOSI continued to sell both New Holland and Case International in Harrisonburg. (Tr. 36-37.)

SI was incorporated in 1987 and the initial directors were Mr. Stickley, Sr., Dan, Jr., and Dr. Stickley. (Pl.'s Ex. 3.) The Articles of Incorporation do not state a purpose, and SI has its own set of by-laws. (Tr. 35.)

Dr. Stickley strongly suggested that the real estate in Staunton be purchased by SI instead of leasing the property from the previous owners. In fact, his suggestion was followed, and Dr. Stickley loaned SI $100,000 to assist in its financing of the land purchase. (Tr. 197.)

SI issued 5000 shares of stock to JOSI. (Pl.'s Ex. 2.) SI stock is carried on JOSI's books at a value of $50,000. (Jt. Ex. 4-3/1995; Pl.'s Ex. 37, Ex. 4; Tr. 615.) Dan, Jr., apparently voted the 5000 shares of stock in SI himself without seeking the concurrence of the other JOSI directors or shareholders. (Tr. 37, 71.) SI has never paid a dividend.

The Board of Directors of SI was Dan, Jr., Julia, Dr. Stickley, David Walsh, the General Manager of SI since its inception, (Tr. 63), and Mr. Walsh's wife, Joan. In 1992, Dr. Stickley was also removed from the SI Board. (Tr. 72.) Dr. Stickley was never given notice of an actual meeting, and he, Julia Stickley, and Joan Walsh never attended one. (Tr. 197.)

Dr. Stickley, now age 63, worked on an occasional basis in the family store while growing up. As a family corporation, it was essentially an extension of the family. He graduated from the Virginia Military Institute and Bowman Gray School of Medicine at Wake Forest University and completed his residency at the University of Virginia Medical School as an anesthesiologist. Interested in marine biology, Dr. Stickley built a seafood processing plant and operated a seafood business on the Eastern Shore of Virginia until 1986. He also was involved with a real estate investment partnership in the Winchester, Virginia, area and continued on a nearly full time basis with his medical practice. (Tr. 199-201.)

Dan, Jr., in contrast, now age 65, had worked in the store all his life after military service, under the direction of his father. He and his family lived on one of his father's farms rent-free for a substantial number of years. (Tr. 469, 477-78.)

In 1986, Dr. Stickley moved back to the farm at the request of his father because of problems with Dan, Jr., and the probability or possibility of his leaving the family business. When Dr. Stickley inquired about Dan, Jr.'s plans to leave the business, Dan, Jr., said, "Mind your own business." (Tr. 192.)

From 1986 to April 1993, Dr. Stickley farmed his father's land full-time while continuing to work every weekend (Friday to Monday) as an anesthesiologist at a hospital in Virginia Beach. In April of 1993, Dr. Stickley began to reduce his workload at Virginia Beach (Tr. 459) and worked during the week at Rockingham Memorial Hospital. He still operated his own real estate business and his father's farm.

The financial statements prepared by S. B. Hoover & Company solely for J. O. Stickley & Son, Inc., show continued losses: 1990 ($80,893); 1991 ($100,578); 1992 ($212,098); 1993 ($180,184); 1994 ($32,855); 1995 ($180,000). (Pl.'s Ex. 37-Ex.s # 2, # 2A; Jt. Ex. 4: 1995.)

Based upon book value, the per share value decreased from $1,089.93 per share in 1990 to $889.79 in 1994. (Pl.'s Ex. 34.)

Bill Simmons, the JOSI Sales Manager, said that after Mr. Stickley, Sr., stopped coming to the store, the volume of sales at JOSI dropped, (Tr. 664), and customers were lost. (Tr. 665.) As he said, "We wasn't selling." (Tr. 664.)

Dr. Stickley, who went to the store regularly, observed very little customer traffic. The shop was not busy, and they begged him for equipment to repair. The morale appeared to be low, and the business clearly appeared to be dying. (Tr. 244, 248.)

Concurrently, SI in Staunton was increasing sales from $1.7 million in 1990 to $2.1 million in 1994. (Pl.'s Ex. 37, Ex. # 3A.) Under David Walsh's management, SI made a profit every year after the first year. (Tr. 69, 72.) SI sold Ford products only. There was already a Case International dealer in Staunton and all other lines were represented in Staunton. (Tr. 69.) SI also had a truck servicing and repair operation for medium duty fleets in the area, (Tr. 67), repair, inspection, etc. SI sold a limited number of Toro push mowers and serviced the goods it sold. (Tr. 67.)

Dan, Jr.'s only involvement in SI apparently was financing and going to Staunton to review the receivables once a month. (Tr. 75.) Dan, Jr., was not paid by SI.

David Walsh testified that the JOSI and SI were always operated as separate corporations. (Tr. 70.) The two corporations did business at arms length. (Tr. 50, 72.) The two stores were, in fact, in competition to some extent. (Tr. 72.) The only equipment that JOSI and SI had in common was New Holland and Toro until 1991. JOSI did not have a truck service, and SI did not have an appliance line or Case International. Micki Peoples, the head

bookkeeper for JOSI, went to Staunton to run quarterly reports because the financial records were kept separately on different systems. (Tr. 93, 153.) Dan, Jr., came by the SI offices approximately once a month to look over the accounts receivable. (Tr. 75.)

Dan, Jr., attempted to depict the two corporations as "completely integrated." (Tr. 909.) He said legally SI was a separate corporation, but in actuality it was a department of JOSI. (Tr. 40.) David Walsh was candid in his testimony about the way the businesses operated. There is nothing in the operation described by Walsh from which one could conclude that SI was a *de facto* "department" or "division" of JOSI. In 1992, David Walsh began to divide his time between the two corporations to oversee both businesses. (Tr. 78.) When he came, Walsh said that the sales of agricultural equipment by JOSI were not what they should be. (Tr. 80.) There was a lack of experience and many employees were not productive on account of age and health. (Tr. 78-80, 83.) He found that overhead was too high and margins for sales were not competitive. (Tr. 82.) He worked at helping the JOSI operation, but said he could not do any good and went back to SI in Staunton on a full time basis. (Tr. 81.)

Sometime in 1992, Bill Simmons, the Sales Manager of JOSI, made a special visit to Dr. Stickley at his home to express his concerns about Dan, Jr.'s health problems and the low morale and friction among the employees, hoping for assistance. (Tr. 251, 667-68.) Dr. Stickley made an appointment to meet with Dave Walsh at SI in Staunton to see what he was doing differently since his organization was profitable. (Tr. 252.)

Dan, Jr., admitted that he gave the directors and shareholders only the "short form" financials (pages 1-8) consisting of the consolidated financials for the Corporation and Stickley's. (Tr. 875.) Unconsolidated financial statements were prepared every year, but Dan, Jr., never gave Dr. Stickley the supplementary information showing the reports of each corporation even when Dr. Stickley was a Director of the Corporation. (Tr. 261-62.) Dan, Jr., kept saying he was not entitled to it. (Tr. 261.) The unconsolidated financials showed the serious deterioration of JOSI's Harrisonburg operation under Dan, Jr.'s management and the relative prosperity of the SI operation in Staunton under Mr. Walsh's tutelage.

Even when Dr. Stickley specifically requested unconsolidated financials in January 1996, Dan, Jr., refused. (Tr. 261-63.)

There was an enormous amount of testimony concerning why the operations in Harrisonburg seemed to be suffering increasing losses under the tutelage of Dan, Jr., while the Staunton operation under the management of David Walsh was increasingly profitable. In the final analysis, however, the

reason for the Harrisonburg losses are not relevant. What is relevant, however, is that Dan, Jr., carefully concealed these facts from fellow shareholders by distributing only consolidated financial statements, *i.e.* the result of JOSI and SI were combined so that the relative performance of the two corporations could not be ascertained.

In the Fall of 1989, Dan, Jr., began exercising a power of attorney executed by Mr. Stickley in 1982, apparently taking total control of the financial affairs of his father. For some years, Dan Stickley, Sr.'s estate planning had divided his assets substantially equally between his two sons. (Tr. 474, 477, 549.)

In 1992, the President, Dan, Jr., proposed amendments to the Articles of Incorporation of JOSI that, *inter alia*, permitted the issuance of preferred stock and eliminated stockholders' preemptive rights. (Pl.'s Ex. 1.) Dan, Jr., stated that the Corporation's attorney said the changes were needed to modernize the corporation if they wanted to sell it. (Tr. 208.)

In 1992, Dan, Jr., acting as President, also proposed new By-laws for JOSI which, *inter alia*, (1) removed the access to corporate records by directors and shareholders from the by-laws, (2) made it official for nonstockholders to serve as Directors, and (3) established a right of first refusal for shareholders to sell stock. (Jt. Ex. 2-a.)

Dr. Stickley consulted an attorney in Winchester, Virginia, John W. Truban, Esq., concerning the proposed changes to the Articles and By-laws and determined that the changes would be detrimental to minority shareholders. (Tr. 211-12.) Dr. Stickley, delivered Attorney Truban's written opinions and suggestions concerning the family corporation and Mr. Stickley's estate to Dan, Jr. (Pl.'s Ex. 5.)

When Dr. Stickley through his counsel inquired of the JOSI's attorney about the change in the Articles of Incorporation at his deposition in August 1996, Dan, Jr., invoked the attorney-client privilege on behalf of the Corporation and did not allow the Attorney to answer. (Tr. 237-38.) Although this exertion of attorney-client privilege by the President and majority shareholder of the corporations was technically appropriate, it does raise serious questions as to what the majority shareholder's motivations were in trying to change the corporate documents in a way that would reduce the power and rights of the minority shareholder.

Mr. Stickley, Sr., held demand notes made by the Corporation paying quarterly 10% interest per annum. In 1985-86, Dan Stickley, Sr., as part of his estate planning, gifted these notes to Dan, Jr., and Dr. Stickley and members of their families. (Tr. 205.)

In August of 1992, Dr. Stickley, noticing a discrepancy in the interest payments on the notes held by himself and his son, Willie, questioned Dan,

Jr., about this, and Dan, Jr., stated that he had issued new notes to replace the original notes changing the term to three years and lowering the interest rate from 10% to 8%. (Tr. 205-06.)

Dr. Stickley categorically denies having agreed to a change in the terms of the note. (Tr. 207-08.) Moreover, Dan, Jr., never delivered the altered notes to Dr. Stickley. (Tr. 207, 368.) Dan, Jr., told the JOSI bookkeeper, Micki Peoples, that he would give Dr. Stickley the new notes dated March 1, 1992, and get the old ones back. (Tr. 182.) Micki Peoples never got the original notes back. (Tr. 175.)

Dan, Jr., refused to honor the original notes, and he apparently expected Dr. Stickley to acquiesce in his unilateral change in the notes. (Tr. 208.) Dr. Stickley consulted two attorneys before he was satisfied that the President could not unilaterally alter notes without the agreement of the note holders. (Tr. 206-08.) Therefore, Dr. Stickley demanded full payment of the notes in accordance with their original terms.

Dr. Stickley, having received no indication that he would be paid, filed suit on the original demand notes on October 22, 1992. (Tr. 241.) He sued on two notes not marked paid or canceled.

After October 14, 1992, Dr. Stickley felt the company was going downhill, the losses going from $16,000, $12,000, to $88,000 to $104,000 to $144,000 and getting worse every year. According to Dr. Stickley, since he had no input into the Corporation and the rest of his inheritance was going down the tube, "I might as well take what I could get out of the notes and salvage at least that of my father's inheritance." (Tr. 253.)

Two days before the November 24, 1992, warrant return date in General District Court, the President paid off Willie's $10,000 note. (Tr. 241.) The second suit was nonsuited because Dan, Jr., agreed to pay the $50,000 note. The attorneys continued to negotiate over the $50,000 note owed to Dr. Stickley. (Tr. 241.) Even though the bank approved the withdrawal of $50,000 to pay Dr. Stickley's note, Dan, Jr., still refused to pay off the note according to the original terms. (Tr. 882.)

At the shareholders' meeting of JOSI on January 6, 1992, Dan, Jr., the President, announced that JOSI had lost $100,000 in 1991. (Jt. Ex. 3: S/1992; Tr. 203.) Dan, Jr., told the stockholders that general business in the overall agriculture industry was in bad shape and that all farm implement dealers were losing money. (Tr. 205.) However, the testimony of experts at trial indicated that in the late 1980's and early 1990's, the agricultural industry in the Shenandoah Valley was in excellent shape.

In mid-year 1992, Dr. Stickley, a Director and a 35% stockholder, requested of Dan, Jr., "Let's sit down and go over the books" to review the

status of the business and see what changes could be made in view of the losses of the previous year. (Tr. 203, 874.) Dan, Jr., refused Dr. Stickley access to the current year's financial information in response to this initial request. Dan, Jr.'s response was along the lines: "You won't get that," and he walked away. (Tr. 205, 874.) When Dr. Stickley made the request a second time according to Dan, Jr.'s recollection, Dan, Jr., stonewalled by asking, "What books?." (Tr. 874.)

Dr. Stickley also requested the stock transfer book and Dan, Jr., refused saying, "Hey, you know who the stockholders are." (Tr. 874.) Actually, Dr. Stickley did not know until after the end of 1992 that Mr. Stickley, Sr., held no stock in the Corporation. (Tr. 187, 451.) Dan, Jr., had apparently not told his brother and principal minority shareholder that their father's shares had been transferred to Dan, Jr.'s daughters. His father had merely endorsed the stock certificates without filling in the transferees. (Tr. 969-70.)

On account of the President's refusal to open corporate records, Dr. Stickley hired an attorney who made a form written request dated October 8, 1992, sent to the attorneys representing Dan, Jr., and the corporation at the time. (Jt. Ex. 7; Tr. 132, 239.) October 14, 1992, was the date mutually agreed upon to review the records.

On October 14, 1992, Dr. Stickley and John R. Fisher, his CPA from Winchester, Virginia, went to the JOSI corporate offices at 600 West Market Street to review the financial books and records as requested, but the President gave Mr. Fisher only a box of canceled checks to use to put together a report of the current financial status of the Corporation. (Tr. 240.) Dan, Jr., admitted that he "tossed him a box with the check stubs in it." (Tr. 875-76.) The bookkeeper, Micki Peoples, was not present in the store. When they asked for the ledgers, the President told them the records were not there. (Tr. 243.)

Micki Peoples testified that the JOSI ledgers were gone from the office for "roughly three to six weeks." (Tr. 171.) She testified that Dan, Jr., had removed the books from the corporate office and had told her the books would be gone because Bill wanted to go over them. This caused Ms. Peoples to believe the reason was the accuracy of her bookkeeping. (Tr. 156, 157.) In addition, it resulted in the corporate financial records conveniently not being available at the corporate offices when Dr. Stickley's accountant was there to inspect the books.

Dan, Jr., admitted that he was "playing games" with his brother and his brother's accountant. (Tr. 875.) On October 14, 1992, Dan, Jr., would not make available the current financial statements for 1992. (Tr. 133.) He gave only consolidated financials which did not break down the relatively poor

performance of JOSI compared to the positive performance of SI. (Tr. 108, 110.) This was generally consistent with Dan, Jr.'s view that he and his side of the family really owned JOSI and that Dr. Stickley was an unwanted and ungrateful interloper.

On October 14, Mr. Fisher was finally able to review the stock transfer book and informed Dr. Stickley that the remaining shares of Mr. Stickley's stock had been transferred to Dan, Jr.'s daughters, which Dr. Stickley did not know because Dan, Jr., had earlier denied the fact. (Tr. 109, 187, 451.) Dr. Stickley returned to his attorney to inform him of the actions of Dan, Jr., denying access to the corporate records, resulting in yet another trip for Mr. Fisher set for November 4, 1992. (Tr. 240.)

On November 4, 1992, Mr. Fisher, the CPA, drove down from Winchester a second time to go over the books. (Jt. Ex. 8.) The bookkeeper was not present. This time he went over the ledger for nine months of 1992 for JOSI only. (Tr. 115.)

Dan, Jr., still refused to make the unconsolidated financials available, i.e., the supplemental information for each corporation separately. (Tr. 140-41.) The President denied access to those reports stating that SI was a separate corporation (Tr. 43, 141), and Dr. Stickley's attorney had not specifically asked in writing for information on that separate entity. (Tr. 141.) It was Dan, Jr.'s position that no "legal request" had been made. (Tr. 44.) This position, of course, was totally inconsistent with Dan, Jr.'s earlier testimony that the two corporations were essentially one and the same and operated as a single family enterprise.

This attitude of Dan, Jr., that all corporate formalities should be adhered to in denying access to SI records by his brother is also in stark contrast to the position he takes when addressing the "sale of substantially all of the assets" issue. In the later case, he urges substance over form and advances the proposition that SI was essentially a division or department of JOSI.

Fisher, the CPA working for Dr. Stickley, had some difficulty putting together a report by "working backwards" in his calculations and analysis. (Tr. 114.) However, on November 4, 1992, Mr. Fisher reported to Dr. Stickley that he projected a loss in 1992 of $150,000 for JOSI, but that SI was making a profit. (Tr. 115, 117.) JOSI's sales had fallen from approximately $3,400,000 in 1987 to $2,600,000 in 1992. (Tr. 249.) During this same period, SI's sales had increased from $3,254.00 to $1,737,588.00. (*Compare* Jt. Ex. 4, 1988 at p. 13 with Jt. Ex. 4, 1992 at p. 13.) The accountant also informed Dr. Stickley that his father's money was being loaned to the Corporation by the President acting under a power of attorney, which Dr. Stickley heretofore did not know. (Tr. 366.) Dan, Jr., also borrowed against the value of the life insurance

policies to produce cash for the Corporation. (Tr. 121.) The inventories were increasing while sales were decreasing. (Tr. 117.) Fisher, who represented twelve to fifteen agricultural equipment dealers in his CPA practice, said that in his judgment if management could not change, then the property should be sold. (Tr. 145.)

A couple of weeks later, the President called a special meeting of the shareholders for a Friday evening (4 to 5 p.m.) December 4, 1992, for the purpose of adopting the new By-laws. (Tr. 254.) In 1992, Dr. Stickley worked weekends at a hospital in Virginia Beach, a fact well known to Dan, Jr., who lives next door to his brother, so Dr. Stickley could not attend. (Tr. 254.)

Dan, Jr., refused to change the stockholders meeting even though the annual stockholders' meeting would be one month later, (Tr. 255), because it suited "the girls." Therefore, Dr. Stickley was forced to send an attorney as his proxy to represent him at the meeting to consider the only changes proposed in the By-laws of the Corporation since 1911. (Tr. 255.) However, only Carolyn Bragg attended, the other daughters of Dan, Jr., were represented by proxy which was voted by Dan, Jr. (Jt. Ex. 3-S/1992.)

Dan, Jr., having used the power of attorney from Mr. Stickley to transfer his father's remaining shares to his daughters, then relieved himself of the fiduciary duty to vote those shares for his father. (Pl.'s Ex. 39.)

On December 4, 1992, over the objections of Dr. Stickley's proxy, new By-laws were adopted. (Jt. Ex. 2-a.) Dr. Stickley's proposal that a quorum be two thirds so that he could be assured of being at all meetings was voted down. (Jt. Ex. 3-S/1992.)

One month later, at the annual stockholders' meeting on January 5, 1993, Dr. Stickley was denied a seat of the Board of Directors of the Corporation by the Control Group. Dan, Jr., voted his daughters' Barbara's and Mary's proxies. In addition to Dan, Jr., Julia, and Carolyn the Control Group elected David Walsh and Ms. Norma "Micki" Peoples, both non-stockholder employees of the Corporation as Directors. Dan, Jr.'s daughter, Carolyn, who owned 57 shares, replaced her uncle on the Board of Directors. (Jt. Ex. 3-S/1995.)

Dan, Jr., said he did not want Dr. Stickley on the Board because Harrisonburg is a small town and everyone would know about the General District Court lawsuit that Dr. Stickley had filed over the unpaid promissory notes. (Tr. 888.)

Dan, Jr., told his family that Dr. Stickley did not deserve to be a director since he brought suit on the demand notes. (Tr. 257.) None of Dan, Jr.'s family members were clear on the facts about the notes, but based on the information told them, they all voted to ratify his actions in altering the notes

without agreement of the note holders. (Tr. 315-16, 318, 328, 331-32, 333, 705, 889.) Carolyn refused to believe that her father would take action that was not agreed upon, (Tr. 318), but interestingly Dan, Jr., never unequivocally testified that Dr. Stickley agreed to extend the term or the 8% interest rate on the note.

The proposal to add "outside" directors may well have been a pretext for removing Dr. Stickley from the Board. Mr. Walsh and Mrs. Peoples were employees of SI and JOSI respectively and were dependent upon Dan, Jr., for the continuation of their employment. Also, the testimony of the other Directors, Dan, Jr.'s wife and two of his daughters, indicated that they initially knew nothing about the details of the company's business, made no independent analysis or decision on corporate matters, but merely followed the directions of Dan, Jr., on all corporate matters. In fact, their testimony was quite revealing in that their sole function as Board members seemed to be to carry out Dan, Jr.'s wishes in conducting a freeze out and vendetta against the principal minority shareholder, his brother.

One month later, on February 3, 1993, Dan, Jr., used his position as President of the Corporation and his power of attorney from Mr. Stickley, Sr., to change the beneficiaries of Mr. Stickley's life insurance policy from Dan, Jr., and Bill equally, to take it all for himself. (Pl.'s Ex. 36-A; Tr. 891-93.) The life insurance policy was part of the Aetna health insurance benefits for the employees, including retired employees. (Tr. 173.) Dan, Jr., never informed his brother of what he had done. (Tr. 422-25.)

Mr. Stickley originally had his wife as beneficiary, and when she died, he made his two sons beneficiaries. (Tr. 891-92.) Mr. Stickley had gifted out the other insurance policies that he owned as part of his estate planning in 1985-86 equally between the two families. (Tr. 423.)

By March 19, 1993, Dan, Jr., had not paid off the $50,000 owed on the note to Dr. Stickley. (Jt. Ex. 9; Tr. 260.) In July of 1993, after nine months of not getting paid, Dr. Stickley finally took the $50,000 in installments. (Tr. 9, 507.)

John Fisher made a written report to Dr. Stickley dated February 23, 1993, (Pl.'s Ex. 9), which was delivered to Dan, Jr., to read, (Tr. 368), which warned that, unless management changed, the business would collapse. He urged that the business be sold or liquidated immediately so that the value of the real estate could be preserved. He said that new management could turn the business around. (Tr. 122.)

When the 1992 financial statements prepared by S. B. Hoover were then distributed to the stockholders, Dr. Stickley got only the "short form" consolidated again, the losses from 1992 were reported as $100,000. (Tr.

123.) There was, however, an error on the parts inventory in 1992 so that the consolidated net losses were reported at $77,526 lower than they actually were. (Jt. Ex. 4-1992 p. 3; Tr. 124.) This error was corrected on the 1993 financial statement showing 1992's net loss at $166,083. (Jt. Ex. 4-1993 p. 3; Tr. 128.) JOSI's unconsolidated losses alone were $212,098. (p. 13.)

The next meeting of the shareholders was not held until April 13, 1994. (Jt. Ex. 3: S/1994.) Dr. Stickley, denied a seat on the Board again, asked to be notified of all Corporate actions. The only access Dr. Stickley had after removal from the Board was annual stockholders' meetings. (Tr. 260.)

At the next annual meeting of the shareholders on January 5, 1995, Dr. Stickley unsuccessfully ran for the Board of Directors. This time, the votes of Dan, Jr., Julia, and Mary in person, and the proxies of Carolyn and Barbara, were used to place Mary on the Board of Directors in place of Carolyn and denied Dr. Stickley a seat. (Jt. Ex. 3-S/1995.)

In November 1994, Dan, Jr., proposed to enter into a deal with Andy Johnson to transfer assets of the Corporation to another corporation of which Dan, Jr., and his wife Julia, and Johnson and his wife would constitute the Board of Directors and there would be no participation for Dr. Stickley. (Pl.'s Ex. 29, Tr. 264.) Dan, Jr., said Bill would not have a vote when those assets were transferred. (Jt. Ex. 3-S/1995.) For various reasons not relevant here, this deal fell through.

When a proposal was received from Rockingham New Holland, Inc., to purchase the assets of JOSI (hereinafter "the sale"), Dan, Jr., explained that he intended to use the proceeds of the sale so that JOSI could be used as a vehicle to go into land investment. (Tr. 278, 396, 913.) Dan, Jr., planned to invest in other companies and expand SI. (Tr. 913-14.) The expansion of SI was presumably: "So we could get away from the tax consequences of being an investment company." (Tr. 913.)

In mid-February, Dan, Jr., took a draft copy of the Rockingham New Holland proposal dated January 13, 1995, to Dr. Stickley. (Pl.'s Ex. 17.) At that time, he wanted Dr. Stickley to agree to the sale. Dr. Stickley sought advice from an attorney as to the deal, and he requested additional financial information. (Pl.'s Ex. 10, 16.) He received nothing, (Tr. 277), not even by March 4. (Tr. 281, 723.) The attorney representing JOSI in this transaction arranged for Dan, Jr., and James B. Hoover, JOSI's accountant, (hereinafter "Hoover") to meet with Dr. Stickley on February 20, 1995, to go over the draft contract. (Tr. 282.) However, unknown to Dr. Stickley, on the previous Friday, February 17, 1995, Dan, Jr., had signed the contract warranting in paragraph 7(B) that he had full authority. He carried a document entitled

"consent to a meeting of the Board of Directors" on February 17, 1995, around for the signatures of the other board members. (Tr. 86, 152.)

Mr. Walsh, one of the employees on the Board, admitted that he signed without question, never read the contract, or made inquiry. (Tr. 86-87.) Mrs. Peoples signed thinking that Dan, Jr., and his family had enough votes (a majority to sell without Dr. Stickley's consent). (Tr. 153-54.) Julia and Mary signed without independent inquiry. (Tr. 326-28, 688.) Not one member of the Board of Directors made an independent inquiry of the lawyers or the accountants nor of the minority stockholder. Every Board member relied solely upon information Dan, Jr., provided to them.

At the meeting on the following Monday, February 20, 1995, on the basis of the January 13, 1995, draft, Dr. Stickley questioned the interest rate on the $725,000 note, the sale of the real estate for $725,000, (Pl.'s Ex. 28), and the discounting of the inventories by 15% as written in the Draft Contract. (Pl.'s Ex. 15; Tr. 279-80, 371-72.) Dan, Jr., told Dr. Stickley that changes were being made on a second draft in spite of the fact that Dan, Jr., had signed a final contract three days before this conversation. (Tr. 282.)

The Accountant said he would work out scenarios to get the money out to the various stockholders. Dr. Stickley testified at the hearing that, "So you assume ... as they said, they were selling all the assets and functioning of the corporation, therefore, they were dissolving it." (Tr. 283.)

At the end of the meeting, Dan, Jr., asked Dr. Stickley whether he would approve the sale and Dr. Stickley stated that he would like to wait to see the second draft. (Tr. 283-84.)

Dr. Stickley learned the next morning that a contract dated February 15, 1995, had been signed on the previous Friday (February 17) before his Monday meeting. (Tr. 284.)

Neither the JOSI's accountant nor Dan, Jr., brought a copy of the executed contract to the meeting and neither of them had informed Dr. Stickley that the contract had already been signed. (Tr. 285, 514-15, 901.) As a result, Dr. Stickley understandably told Dan, Jr., he felt he could not believe anything Dan, Jr., said to him. (Tr. 284.)

On April 24, 1995, Dr. Stickley made written demand to the defendant Corporation for the redemption of his shares in return for $600,000 and having one-third of the antique farm equipment delivered in kind. (Pl.'s Ex. 26.)

Through another "consent," the Board of Directors, consisting of Dan, Jr., Vice-President, Julia, Treasurer, Mary, and David Walsh, denied his request on April 27, 1995. (Jt. Ex. 3-B/D 1995.) The basis of the $600,000 request

was the value that the Corporation's accountant put on the value of Dr. Stickley's 35% at $607,000. (Tr. 722.)

The President stated that the value of the real estate in Staunton at the time of the sale was $350,000. (Tr. 56.) However, the defendant Corporation never made this information available to Dr. Stickley until John B. Hoover of S. B. Hoover & Company produced Exhibit 15 and 15A by order of this Court on August 26-28, 1996. The defendant Corporation did not even produce the 1993 appraisal for the Staunton real estate until after the suit was filed. (Tr. 301.) This financial information was in the possession of the Corporation but withheld from Dr. Stickley when the stock redemption agreement was being negotiated. (Tr. 302.)

Unknown to Dr. Stickley at that time was a 1993 appraisal of the Staunton real estate at $350,000 until the first day of trial. (Tr. 590.)

The Corporation's end-of-year financials for 1994 had been delivered to S. B. Hoover, but the President never would authorize release of them to Dr. Stickley. (Tr. 289, 291.) During the negotiations for the stock redemption, he denied Dr. Stickley the benefit of the 1994 financial status as prepared by the Corporate accountants. The 1994 financial statements were not produced for Dr. Stickley prior to the Memorandum of Understanding dated March 7, 1995. (Tr. 724.) The corporation actually fared better in 1994 than in 1993, (Jt. Ex. 4: 1993, 1994), but lost $180,000 in 1995. (Tr. 405.) This favorable 1994 information was denied to Dr. Stickley.

Inspection of the financial statements prepared by S. B. Hoover for the years 1988 through 1995, (Jt. Ex. 4), shows that the financial statements were always dated prior to March 15, the due date of the corporate tax return for each year from 1988 through 1993, most often available in February of the following year.

The 1994 financial statements, in contrast, were not prepared until March 31, 1995, and the filing of the tax return was extended past March 15. The ostensible reason for the delay in preparing the financial statements in a timely fashion was that the President did not authorize the accountants to pay $100.00 to get certain tax basis information from one of the Corporation's insurance carriers. Although the insurance company would supply the basis for certain life insurance policies that were surrendered during that year for a $100 fee, S. B. Hoover ended up doing the calculations after Dan, Jr., provided information to them. (Tr. 724-25.)

The accountant testified that, at a request from counsel for Dr. Stickley dated March 4, 1995, he secured financial statements prepared in-house by the Corporation dated February 28, 1995, for two months of operations, and supplied those with in-house statements from JOSI dated January 31, 1995,

and later supplied February 28, 1995. Therefore, Dr. Stickley was correct in saying that even though S. B. Hoover had the end-of-year 1994 financial information from J. O. Stickley, Dan, Jr., would not allow its release. (Tr. 723-24.)

The President used as an excuse the necessity for getting a quote for insurance to delay the filing of the 1994 corporate tax return. John B. Hoover said the information from the insurance company for the basis of insurance policies that were surrendered could be relied upon. (Tr. 728.) However, John Hoover had to wait for Dan, Jr., to get the information on the insurance policies to do it himself. (Tr. 747.) The 1994 financial statements are dated March 31, 1995, but were not given to Dr. Stickley until after he filed suit.

The content of the various redemption discussions are not important or relevant. What is relevant is the deliberately deceptive way in which he manipulated corporate information for his own benefit and to the detriment of his brother. Again the inescapable conclusion is that Dan, Jr., as he did with the accountants' review in October of 1992, continued "to play games" with his brother by deliberately delaying the preparation of JOSI financials to benefit Dan, Jr., personally. The President admitted to raising his salary after the sale from $36,000 to $48,000, and that he intended to continue to draw $48,000. (Tr. 909-12.) In 1995, the President collected approximately $61,000 in corporate salary and benefits. (Jt. Ex. 5; Tr. 405.)

The President was no longer operating a business supervising twenty-one employees and $2.4 million in sales. He was the only employee of JOSI. (Tr. 410.) He was collecting quarterly checks from Rockingham New Holland on the real estate, quarterly checks from the accounts receivable collected by Rockingham New Holland, and monthly checks on the equipment leases. (Tr. 405-06.)

Mensel Dean, a certified public accountant, testified salaries considered by the Internal Revenue Service to be unreasonable, based upon factors like the amount of time spent, the expertise, and the responsibility, would be potentially disallowable as deductible expenses, and thus would increase the corporation's taxable income and as a result decrease shareholders' equity. (Tr. 623.)

The gross income from sales of the Corporation in 1995 was $227,983.00 which generated an operating loss of $180,161.00. (Jt. Ex. 4: 1995, p. 17.) For the first eleven months of 1996, the corporation had sales of $1,650.00 and other income of $80,764.96 (generally passive income). (Pl.'s Ex. 40.) However, in this same period, the President paid himself $36,000 in salary and paid to his family $2,000 in directors' fees. (Pl.'s Ex. 40.) Patently, the

President was paying himself a salary that had no rational nexus to the size of the corporation and was clearly to the prejudice of the minority shareholder.

David Walsh said that the President came about once a month to Staunton to review the accounts receivable. In 1995, Dave Walsh took care of the health and other insurance himself. Dan, Jr., was not actually going to Stickley's once a month after the sale. (Tr. 406.) In fact, he was out of the country two months. (Tr. 405.)

The Corporation's passive (unearned or nonoperating) income for 1995 was 56.4% of its total income. (Pl.'s Ex. 38-A.) Mensel Dean explained that unearned income of 60% or more would cause the corporation to incur additional tax on the income: a penalty tax of 39%. (Tr. 633.) If sales in the two months of operation in 1995 had been $7,000 less, the Corporation would have been a personal holding company for income tax purposes in 1995.

At the next annual shareholders' meeting January 5, 1996, Dan, Jr., presented a glowing report of the financial success of the Corporation. Along with Dan, Jr., and Julia, Mary was again elected to the Board of Directors and appointed Treasurer. (Jt. Ex. 3-S/1995.)

The annual shareholders' meeting in January 1996 was held at Dan, Jr.'s home with Dan, Jr., Julia, Mary, Carolyn, and Dr. Stickley present. The President said that almost all the accounts receivable had been collected and he is managing a portfolio of approximately $300,000 invested by Wheat, First Securities. (Tr. 411.) After the meeting, Dan, Jr., told Dr. Stickley in another frank exchange that he was drawing a large salary to bleed the proceeds of the sale out of the Corporation. (Tr. 411.) Dan, Jr., apparently intimated he was planning to find a way to redeem the stock of his daughters and make no provision for Dr. Stickley. (Tr. 411-12.)

The following assets were transferred to Rockingham New Holland under the February 17, 1995, Contract: (1) real estate (land and buildings) consisting of 5.34 acres on West Market Street, Harrisonburg, (2) whole goods and parts inventories, (3) shop equipment, vehicles, furniture, fixtures and computers, and (4) miscellaneous office and shop supplies. (Pl.'s Ex. 19, Executed Contract.) The sale of each of these assets is confirmed by the March 1, 1995, Financial Statement. (Jt. Ex. 4: 3/1995, p. 2.)

In addition, the franchise to sell Ford/New Holland, all the employees, collection of the accounts receivable and the customers lists, and the phone numbers were transferred to Rockingham New Holland. (Tr. 163.) Micki Peoples collected at least 80% of the accounts receivable. (Tr. 161-62.)

The assets retained were promissory notes, the investment portfolio consisting of common stocks, and the corporate name, plus a computer and some antique farm equipment. (Tr. 407.)

The Corporation did not retain any assets to operate a retail business under its Charter. All the operating property and tangibles of the Corporation were transferred. The tangibles transferred were the assets upon which the Corporation earned, or attempted to earn, the income for the Corporation.

The Corporation sold its real estate valued at $752,400 by the City Appraisers, (Defs.' Ex. 14), the inventory valued at $1,480,739 (sold for 15% less under the Contract), the equipment, furniture and fixtures, and vehicles sold for $83,174 under the Contract. (Pl.'s Ex. 19.) No value was shown for the supplies. In value alone, the Corporation sold $2,316,312.80 of assets.

Dan, Jr., withheld Stickley's corporate records from a Director and his CPA, Mr. Fisher, on the basis that they are two separate corporations, (Tr. 140-41), but when it suits him to try to convince this court that the Corporation is "operating" its subsidiary, he testified that they are "completely integrated." (Tr. 909.)

When asked whether or not stockholders who received shares by gift or inheritance should have some sort of return on their investment, Dan, Jr., stated "I wasn't aware they had an investment." (Tr. 935.)

Dan, Jr., is charging his legal fees to defend himself against the acts of oppression in § 13.1-747 to the Corporation. (Tr. 57-58.) Dr. Stickley spent over $94,000 on legal fees and estimates his costs at $130,000. He was able to get it together because of his savings. (Tr. 445-46.) Apparently, Dan, Jr., also has taunted his brother with the fact that, "you are paying 35% of my attorney fees" (referring to the fact that the Corporation is paying all of the Defendants' litigation costs in this case, and Dr. Stickley is a 35% owner of the corporation).

Dr. Stickley generally consulted professionals before making any judgments about Dan's actions. (Tr. 367-68.) He tried in good faith to bring his own business experience and that of John Fisher to contribute some effort towards saving the company. His concerns appear to have been legitimate, (Tr. 429), but were undoubtedly perceived as hostile in the poisonous atmosphere that existed between these brothers.

There was substantial evidence, both documentary and by expert witnesses concerning the proper valuation of JOSI as a going concern, the fair market value of Dr. Stickley's 35% minority interest in JOSI, and whether the sale of operating assets to Rockingham New Holland in 1995 was a sale of "substantially all of the corporate assets" under the terms of § 13.1-730 of the Code of Virginia.

Although there is substantial dispute about the detailed evaluation of various assets, it is clear that in 1995 JOSI sold all of its operating assets to Rockingham New Holland, retaining only accounts receivable, cash, cash

equivalents, and the 5000 shares of common stock in its wholly owned subsidiary SI. The 5000 shares of SI had been carried on the balance sheet of JOSI as an "Investment in Subsidiary" at $50,000.00 prior to the sale to Rockingham New Holland. (*See, e.g.* Ex. 4, 1995 Financial at p. 11.)

Defendants maintain that in determining whether there has been a "sale of substantially all of the property of the Corporation," the underlying asset value of the subsidiary should be added to the assets of the Corporation in determining the total assets involved. According to the contention of defendants, the 1995 sale of the Harrisonburg operation to Rockingham New Holland involved a sale of only 57% of the Corporation's assets if the total asset value of SI is considered and approximately 67% of the operating assets if the *net* asset value of SI is considered. (*See, e.g.* Jt. Ex. 3-CC; Defs.' Ex. 15, 15A.)

Plaintiffs, on the other hand, rely on expert testimony in evaluating the stock of SI and conclude that the total assets owned before the sale in February 1995 (including the assets of SI) was $2,787,361, the assets sold were $2,063,992, and the assets retained were $743,506, constituting a sale of approximately 74% of the total assets.

Of course, if the book value of the SI stock as it was carried on the books of JOSI were used (*i.e.* $50,000), the total assets before the sale were $2,288,084, the assets sold were $2,063,992, and the assets retained were $244,279, constituting a sale of approximately 90% of the Corporation's assets. (Cf. Pl.'s Ex. 35 with Pl.'s Ex 4 (1995 at p. 11).) Although the plaintiffs do not press this argument, they do argue vigorously and with some persuasion that in applying § 13.1-730 of the Code, the court should apply a qualitative test as well as a quantitative one.

The plaintiffs aver that the 1995 sale of JOSI's operating assets denuded the Corporation of the ability to carry out its chartered purpose, *i.e.* conducting a retail and wholesale farm equipment and implement business. Instead, JOSI at best became a holding company, owning the stock of another farm implement dealer in Staunton, but not itself directly owning any assets by which it could conduct a farm implement business. Therefore, plaintiffs contend since the Corporation was only left with notes and stock, it had ceased to be engaged in its principal business, and the dissenting stockholder had a right to an appraisal and buy out.

For the reasons set forth below, the Court finds that the majority stockholder, Dan Stickley, Jr., acting in conjunction with his wife and daughters has turned the JOSI into an engine of oppression and has conducted the corporate affairs in a manner designed to oppress the minority shareholder; therefore, the Corporation must be put in the hands of a receiver

144

for liquidation pursuant to § 13.1-774 of the Code of Virginia. Given this holding, it is not necessary for the Court to reach the numerous factual and legal issues raised in relationship to the dissenter's rights statutes.

*Conclusions of Law*

This proceeding is governed by § 13.1-747 of the Code of Virginia (previously enacted as § 13.1-94 of the Code). This statute is of relatively recent origin and is supplemental to the rights minority stockholders had at common law and the statutory provisions in the Code governing the relationship among shareholders. *See, e.g., E. F. White & P. W. Oil Co. v. Perkins,* 213 Va. 129 (1972).

Although this statute (or its predecessor) has been on the Virginia books for over forty years, there are only a handful of cases construing the statute. *Shultz v. Shultz,* 250 Va. 121 (1995); *Giannotti v. Hamway,* 239 Va. 14 (1990); *Baylor v. Beverly Book Co.,* 216 Va. 22 (1975); *E. F. White & P. W. Oil Co. v. Perkins,* 213 Va. 129 (1972); *Brown v. Scott County Tobacco Warehouses, Inc.,* 5 Va. Cir. 75 (1983) (Coleman, J.); *Williams v. Southern Scrap Co.,* Circuit Court of Winchester (Woltz, J.) (April 18, 1985) (unpublished). Of these cases, the only appellate level cases which provide guidance on the substance of the statute are *Giannotti v. Hamway, supra; Baylor v. Beverly Book Co., supra;* and *E. F. White & P. W. Oil Co. v. Perkins, supra.*

In *Brown v. Scott County Tobacco Warehouses, Inc.,* 5 Va. Cir. 75 (1983), Judge Coleman set out a comprehensive history of this Section of the Code:

> Code § 13.1-94 [now § 13.1-747], suggested by the Model Business Corporation Act, ABA-ALI Model Bus. Corp. Act § 90 (1953), was adopted in its original form in 1956 in the general revision of the laws relating to corporations. Acts of Assembly, 1956, c. 428.
>
> Oppression as a ground for corporate dissolution would appear to be of fairly recent origin. The statutory recognition of this ground first occurred in Illinois in 1933. *Central Life Ins. Co. v. Davis,* 10 Ill. 2d 566, 572, 141 N.E.2d 45, 59 (1957). By 1965 at least eleven other states, including Virginia, had adopted similar statutes. See 1965 Duke L.J. 128.
>
> The word "oppressive," as used in the statute does not carry an essential inference of imminent disaster; it can contemplate a continuing course of conduct. The word does not necessarily savor of

fraud, the absence of "mismanagement, or misapplication of assets," does not prevent a finding that the conduct of the dominant directors or officers has been oppressive. It is not synonymous with "illegal" and "fraudulent" [although those grounds too are codified as reasons justifying liquidation of the corporation]. *Central Life Ins. Co. v. Davis, supra; Gidwitz v. Lanzit Corrugated Box Co.*, 20 Ill. 2d 208, 215, 170 N.E.2d 131, 135 (1960).

The (British) Companies Act of 1948, 11 & 12 Geo. 6, c. 38, s. 210, permits relief to be granted to a stockholder where "the affairs of the company are being conducted in a manner oppressive to some part of the members." In this context it has been held that oppressive means "a visible departure from the standards of fair dealing, and a violation of fair play on which every shareholder who entrusts his money to a company is entitled to rely." (Citation omitted). It has also been held to mean "a lack of probity and fair dealing in the affairs of a company to the prejudice of some of its members." (Citation omitted; emphasis added.) *White and P & W Oil Co. v. Perkins*, 213 Va. 129, 134 (1972).

Prior to Virginia's 1956 enactment and 1968 amendment of § 13.1-94 of the Code establishing illegal, oppressive, or fraudulent acts by officers or directors of a corporation or waste and mismanagement of corporate assets as grounds for liquidation, Virginia courts of equity had the inherent power to dissolve a solvent corporation, but only upon proof that the directors or a majority of the stockholders had been "guilty of fraud or gross mismanagement, or where the principal purpose for which the corporation was formed has become impossible of attainment." *Penn v. Pemberton & Penn*, 189 Va. 649, 653 (1949). There have been relatively few reported Virginia cases seeking liquidation of a corporation pursuant to § 13.1-94 of the Code. See *Baylor v. Beverly Book Co.*, 216 Va. 22, 216 S.E.2d 18 (1975), and *White v. Perkins, supra*.

*Id.* at 78.

From the reported Virginia Cases, it is clear that "This statute is remedial in nature and should be liberally construed." *Baylor, supra*, 216 Va. at 24. The Supreme Court in *E. F. White & P. W. Oil Co. v. Perkins, supra*, had earlier intimated at the breadth of the statute when it stated:

"Oppressive" means conduct by corporate managers toward stockholders which departs from the standards of fair dealing and

violates the principles of fair play on which persons who entrust their funds to a corporation are entitled to rely. The term does not mean that a corporate disaster may be eminent, and does not necessarily mean fraudulent conduct. Indeed, "oppressive" is not synonymous with the statutory terms "illegal" or "fraudulent." The term can contemplate a continuous course of conduct and includes a lack of probity in corporate affairs to the prejudice of some of the shareholders.

*Id.* at 23-24.

In determining the metes and bounds of this statute, it must always be kept in mind that officers and directors occupy a fiduciary relationship to the corporation and its shareholders. *See Glass v. Glass*, 228 Va. 29 (1984). Corporate officers have duties of fidelity similar to those of trustees, and a director who receives personal advantage or profit must account therefor to the corporation or must bear the burden of proof that transactions between himself and the corporation have been fair. *See Giannotti v. Hamway*, 239 Va. 14, 24 (1990); *Adelman v. Connotti Corp.*, 215 Va. 782 (1975). Typical examples of improper conduct are excessive compensation, improper related party transactions, and inadequate dividends paid to stockholders. *Giannotti*, 239 Va. at 24. However, even in the absence of mismanagement or misapplication of assets, a court can find that the conduct of the dominant directors, officers, or shareholders has been oppressive. *See White v. Perkins*, 213 Va. at 134.

Again, in *Brown v. Scott County Tobacco Warehouses, Inc.*, 5 Va. Cir. 75 (1983), Judge Coleman well expressed the extent of the duties owed by a majority shareholder and Director:

He who is in such a fiduciary position cannot serve himself first and his cestuis second. He cannot manipulate the affairs of his corporation to their detriment and in disregard of the standard of common decency and honesty. He cannot by the intervention of a corporate entity violate the ancient precept against serving two masters. He cannot by the use of the corporate device avail himself of privileges normally permitted outsiders in a race of creditors. He cannot utilize his inside information and his strategic position for his own preferment. He cannot violate rules of fair play by doing indirectly through the corporation what he could not do directly. He cannot use his power for his personal advantage and to the detriment of the stockholders and creditors no matter how absolute in terms that power may be and

no matter how meticulous he is to satisfy technical requirements. For that power is at all times subject to the equitable limitation that it may not be exercised for the aggrandizement, preference, or advantage of the fiduciary to the exclusion or detriment of the cestuis. Where there is a violation of those principles, equity will undo the wrong or intervene to prevent its consummation. *Pepper v. Litton, supra*, 311.

*Id.* at 80.

It is hard to imagine a continuous course of conduct earmarked by a total lack of probity and breach of fiduciary duty than the conduct of the controlling stockholder of JOSI towards his brother and minority shareholder. The actions of Dan, Jr., have been patently oppressive by any standard of normal commercial practice and ethics. There is set forth below a non-exclusive brief description of the openly oppressive conduct engaged in by the majority shareholder of JOSI:

(i) Refusing to provide the minority stockholder with "unconsolidated" financials after repeated requests for the same;

(ii) Refusing to produce any books of JOSI's wholly owned subsidiary SI when requested by the minority shareholder;

(iii) Refusing to produce the appropriate financial records of JOSI to the minority shareholder by removing the books from the company's main office in order "to play games with" the minority shareholder;

(iv) Unilaterally changing the terms of JOSI notes held by the minority shareholder by lowering the interest rates;

(v) Unilaterally changing the beneficiaries on Dan Stickley, Sr.'s corporate life insurance policy from Dan, Jr., and Dr. Stickley to Dan, Jr., alone and not informing the minority shareholder of that fact;

(vi) Negotiating to sell all or a portion of JOSI to certain buyers by using a new corporation as a merger vehicle when the minority shareholder of JOSI would have no ownership interest in the new corporation;

(vii) Pretending to discuss and dialogue with the minority shareholder over the sales transaction to Rockingham New Holland when the majority shareholder had already secretly signed a binding contract of sale;

(viii) Stacking the board of JOSI with his wife and children who made very clear when they testified that they made no independent investigation of any of the facts and were perfectly content to blindly

follow their husband and father in his maneuvers against his younger brother;

(ix) Asserting the attorney-client privilege when the plaintiff tried to determine from the corporation attorney the reasons why the majority shareholder wanted to modify the corporate By-laws and Articles of Incorporation;

(x) Refusing numerous requests of the minority shareholder for access to the corporate books and records when the By-laws of the corporation specifically obligated the corporation to make these records available to all shareholders;

(xi) Paying himself unreasonable compensation (*i.e.* increasing the salary of the majority shareholder to $4,000.00 per month) after the · sale of all the corporate assets, and the only "work" for the majority stockholder was overseeing an investment portfolio and other minor administrative matters.

Although the Court has not reached the question of whether the sale of the corporate assets to Rockingham New Holland triggered the dissenters' rights statute, it does appear that the sale was part of a pattern of oppression directed by Dan, Jr., against Dr. Stickley. The sale of JOSI to Rockingham New Holland was obviously designed to avoid triggering dissenters' rights by structuring the sale to cover only about 60% to 70% of the total assets of JOSI. However, after the sale, the only significant asset that JOSI held was its 5000 shares of SI. Thus, Dan, Jr., could have sold all of the assets of SI with a vote by him as the President of JOSI which was SI's sole stockholder. In short, Dan, Jr., had devised a way by which he could dispose of all of the combined JOSI and SI assets without ever having to submit to a vote or a buy-out of the minority stockholder. In short, Dan, Jr., had positioned himself to carry out this threat made at an earlier time when negotiating an abortive buy-out of Dr. Stickley's minority interest. "[H]e would screw me [Dr. Stickley] with or without it [collateral]; it didn't make any difference." (Tr. 533.) ·

Apparently because of tax considerations, Dan, Jr., decided in August of 1996 to have an upstream merger by merging SI into JOSI. This, of course, was accomplished without any involvement by the minority stockholder because JOSI was the stockholder of SI and controlled by Dan, Jr. (*See* Defs.' Ex. 16.) In short, by a combination of corporate stratagems, each have been used to effectively deliver total and absolute control of all of the Corporation's actions and assets to the complete exclusion of one minority shareholder.

An evaluation of whether "oppression" under § 13.1-747 has been proven must look at the total picture of corporate activity; it cannot focus on each

individual act in a vacuum. Much like conspiracies in restraint of trade, very often the stated individual acts when examined in isolation are benign and legal; however, when summed up, they produce an illegal result. It may be that many of the individual acts of Dan, Jr., can pass the test of probity, but the pattern and totality of his acts certainly cannot.

There is no possibility of this corporation continuing under the present circumstances. The animosity of the shareholders and their families is far too great to even believe that the oppression was transitory. The gratuitous acts of spite and vengeance have run the gamut of Dr. Stickley trying to have his brother indicted, and Dan, Jr., claiming that Dr. Stickley had only one "natural" child (thus gratuitously disparaging Dr. Stickley's adopted children). (Tr. 915.)

Therefore, the Court will order that J. O. Stickley & Son, Inc., will be dissolved pursuant to § 13.1-747 and a receiver will be immediately appointed pursuant to § 13.1-748 to wind up and liquidate the corporation.

Counsel for Plaintiff shall prepare an Order incorporating this Opinion and leaving a blank space for the Court to name a receiver. The Order will also provide that the bond of the receiver shall be in the amount of $1,250,000.00 secured by a corporate surety and that the receiver shall retain appropriate legal counsel and certified public accountants to assist in winding up the business and that such professionals will have had no substantial previous dealings with any of the parties to this litigation.

Counsel for all parties are to confer to see if they can agree on an appropriate receiver. If they are unable to agree, each side should submit two nominations for the position of receiver with a short description of why they believe each nominee would be an appropriate receiver.